Mikhail Ratner, Esq. (MR-6264)
Peter Roldan, Esq. (PR-9999)
EMERGENT LLP
*Attorneys for Plaintiffs*
48 Wall Street, 11th Floor
New York, NY 10005
Tel: (212) 498-9816
Email: mikhail@emergent.law
Email: peter@emergent.law

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KSENIA SHNYRA, ALEXANDER REYNGOLD, and KENNETH WALKER, | Case No.: |
| | _____ CV _____ |
| Plaintiffs, | |
| | **COMPLAINT** |
| -against- | |
| | **Jury Demanded** |
| STATE STREET BANK AND TRUST CO., INC., | |
| Defendant. | |

## TABLE OF CONTENTS

NATURE OF ACTION 1

PARTIES 3

    Ksenia Shnyra 3

    Alexander Reyngold 4

    Kenneth Walker 5

    State Street 5

JURISDICTION 6

VENUE 6

EXHAUSTION OF ADMINISTRATIVE REMEDIES 6

FACTUAL BACKGROUND FOR KSENIA SHNYRA 7

    Summary 7

State Street Wrongfully Persecutes Dr. Shnyra,
Its Star Executive, Simply for Being a Woman 8

Dr. Shnyra Experiences Discrimination
at State Street Well Before Her Wrongful Termination 11

    Dr. Shnyra Excels at State Street 24

    Dr. Shnyra Repeatedly Encounters and
    Complaints About Gender Discrimination 26

        *Dr. Shnyra's Mistreatment by an HR Recruitment Supervisor* 26

        *Senior Managers Single Out Dr. Shnyra and*
        *Deliberately Create Conditions for Her Termination* 30

State Street Attempts to Cover Up Its Wrongful Termination of
Dr. Shnyra As Part of Fictitious "Wind-Down" of Her Entire Unit 37

FACTUAL BACKGROUND FOR ALEXANDER REYNGOLD 46

    Summary 46

State Street Repeatedly Discriminates Against Mr. Reyngold
in Promotions and Other Career Growth Opportunities ........ 49

State Street Fires Mr. Reyngold In Retaliation For His
Support of Dr. Shnyra's Gender Discrimination Claims ........ 56

FACTUAL BACKGROUND FOR KENNETH WALKER ........ 65

Summary ........ 65

State Street Effectively Undermines the Very Work for Which Mr. Walker was
Hired ........ 66

State Street Discriminates Against Mr. Walker in its Rush to Dissolve ERAS ........ 68

State Street's Unlawfully Delays Mr. Walker's Hiring Solely Due to His Age ........ 72

COUNTS ........ 75

PRAYER FOR RELIEF ........ 87

Plaintiffs Dr. Ksenia Shnyra ("Dr. Shnyra"), Alexander Reyngold ("Reyngold") and Kenneth Walker ("Walker") by and through its counsel, as and for Plaintiffs' Complaint against defendant State Street Bank and Trust Co., Inc., ("State Street" or the "Bank") allege as follows:

## NATURE OF THIS ACTION

1.      In 2013, State Street, a 225-year-old bank based in Boston whose core business is serving as a custodial banker with trillions of dollars in client deposits, decided to embark on a new business venture.  State Street launched its Global Exchange division to help the Bank and its clients use advanced technology to handle new regulations and exponential increase in the amount of data and analytics. State Street wanted to offer sophisticated, in-depth analytics of financial risk with a deep focus on client-centric service, first internally across State Street's massive workforce and then externally to the Bank's vast stable of custodial clients.

2.      To execute on this ambitious plan, State Street recruited, from the outside, two experienced executives, Alexander Reyngold and Dr. Ksenia Shnyra, to lead a new group, Enterprise Risk Advisory Services ("ERAS").  Through hard work and excellence universally recognized by their superiors at the Bank, Mr. Reyngold and Dr. Shnyra grew ERAS from a two-person shop, at the beginning of 2014, to an outstanding group that, by the middle of 2017, numbered 17 employees and was, by all accounts, vital to the products and services provided by the Global Exchange division and across the Bank, overall.

3.      Then, in one day in October 2017 with no warning whatsoever, Mr. Reyngold and Dr. Shnyra were terminated and their entire group was dissolved.  Remarkably, some of the same executives who had earlier vocally advocated for ERAS and used ERAS as a companywide case

study of outstanding collaboration and efficiency now were rushing to disband a unit that, by all objective measures, was a model of success.

4.      In the days and months that followed, State Street has proffered a whole host of bogus, self-contradicting "business" reasons for this sudden and massive bloodletting: from ERAS's supposed "strategic irrelevance"; to myriad vague performance issues; to alleged failure to meet company-wide "best practices" initiative.  All of these were a pretext to mask the ugly and despicable truths.

5.      Mr. Reyngold and Dr. Shnyra did not fit into the Bank's notorious male-dominated "Boston club" culture.  Dr. Shnyra "dared" to stand up to status quo and complaint about gender discrimination and Mr. Reyngold "dared" to support her, so State Street decided to get rid of them—at all costs. When pushing both out the door by creating intolerable working conditions did not work, the Bank resolved to disband the entire division, and shuffle more junior personnel around, after the fact—all to cover up its wrongful termination of Mr. Reyngold and Dr. Shnyra.

6.      In its public pronouncements and press coverage, State Street has sought to portray itself as a progressive leader committed to "hiring and promoting women" within its ranks. The Bank even commissioned a 4-foot tall statue of a young girl, christened "Fearless Girl," and promptly installed it in front of the famous Charging Bull of Wall Street.

7.      Yet, reality at State Street totally belies its corporate propaganda. This case, in particular, exposes the terrible ways in which the Bank mistreated one of its star female executives, Dr. Shnyra, and her colleagues (the three Plaintiffs here) and the lengths to which the Bank has been willing to go to cover up the truth about State Street's wrongful termination of

Plaintiffs' employment as well as the persistent harassment and discrimination endured by Dr. Shnyra and her colleagues.

8.　　Dr. Shnyra embodied the very spirit of the "Fearless Girl": a woman who bravely took on the status quo.　At State Street, however, Dr. Shnyra paid a terrible price for her courageous actions:　instead of working to address Dr. Shnyra's legitimate concerns, the Bank worked hard to push Dr. Shnyra and out the door and sweep its illicit actions under the proverbial rug.

9.　　At some point in the awful saga detailed below, one of State Street's most senior corporate officers denigrated Dr. Shnyra, an accomplished professional with multiple advanced degrees and long track record of success, as "some girl from Brooklyn."　This—and not some statute paying lip service to gender equality—is the true "spirit" of State Street.

## PARTIES

### Ksenia Shnyra

10.　　Plaintiff Ksenia Shnyra is a citizen and resident of the State of New York, with her principal residence located at 72 Exeter Street, Brooklyn, NY 11235.

11.　　Dr. Shnyra holds advanced degrees in Finance and Computer Information Systems from the University of Rochester, as well as Economics from Moscow Open State University and Finance from Moscow University of Economics, Statistics, and Informatics.

12.　　Dr. Shnyra has spent 13 years in the financial industry, developing, implementing and writing about new approaches to applied risk modeling and financial forecasting.　The products and services pioneered by Dr. Shnyra have become industry benchmarks in banking and finance.

3

13.     Dr. Shnyra's publications on liquidity and asset pricing have been quoted by major financial publications, including the Wall Street Journal and Financial Times and presented at industry conferences worldwide.  She serves as a frequent instructor at major training events for finance professionals.

14.     Prior to joining State Street, Dr. Shnyra led quantitative model validation at Moody's Analytics ("MA") and oversaw quantitative risk modeling for MA's Enterprise Risk Services division.  Dr. Shnyra has also led quantitate analysis projects at Fitch Solutions and JPMorgan Chase.

**Alexander Reyngold**

15.     Plaintiff Alexander Reyngold is a citizen and resident of the State of New York, with his principal residence located at 35 Oceana Drive West, Apt. 3A, Brooklyn, NY 11235.

16.     Mr. Reyngold holds an advanced degree in Economics from Yale University.

17.     Mr. Reyngold has spent 17 years in the risk management industry, working with leading advisory agencies and financial institutions globally.  Among Mr. Reyngold's many professional accomplishments, Mr. Reyngold has authored the flagship model for risk assessment, "RiskCalc."  Mr. Reyngold's numerous publications on credit, market, and liquidity risk have been quoted by major industry periodicals, including the Wall Street Journal and Financial Times.

18.     Before being recruited by State Street, Mr. Reyngold was Head of Modeling at Moody's Risk Management Services and, prior to that, Head of US Quantitative Research Group at Fitch Solutions.

19.     At all relevant times herein, Mr. Reyngold was over 40 years old.

**Kenneth Walker**

20.     Plaintiff Kenneth Walker is a citizen and resident of the State of New York, with his principal residence located at 110 Ramona Court, New Rochelle, NY 10804.

21.     Mr. Walker holds an advanced degree in Business Administration from Monmouth University and is a Certified Public Accountant (CPA). Mr. Walker has spent over 40 years working in risk management, banking, and finance.

22.     Prior to coming to State Street, Mr. Walker was a Managing Director at NewOak Capital.

**State Street**

23.     Defendant State Street Bank and Trust Co. Inc. is a public financial service company founded in 1792 and headquartered in Boston, Massachusetts.  The Bank has a large number of professional offices across the United States including offices in New York, New Jersey, and California as well as several offices globally. State Street's New York office is located at 780 Third Avenue, 8th Floor, New York, NY 10017 State Street is organized into four main divisions:

     a.     State Street Global Services ("SSGS") is a custodian bank with $31.62 trillion of assets under custody and administration;

     b.     State Street Global Markets ("SSGM") offers investment research and trading services to institutional investors. SSGM is a registered broker-dealer;

     c.     State Street Global Advisors ("SSGA") is the investment management arm of State Street.  SSGA clients include corporations, private and public pension plans, endowments and foundations, sovereign wealth funds, central banks, and intermediary investors. SSGA assets under management (AUM) were $2.8 trillion as of December 31, 2017; and

     d.     State Street Global Exchange ("SSGX") is the newest division of State Street Corporation, launched in April of 2013. State Street

> Global Exchange was designed to focus on research, advisory, data, and analytics. Started with 850 employees, State Street Global Exchange had 400 people globally in December of 2017.

## JURISDICTION

24.     This Court has jurisdiction of Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331, as this case, involves questions of federal law.

25.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs' state law claims share all common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiffs' federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

## VENUE

26.     Venue is proper in, and Defendant is subject to the personal jurisdiction of, this Court because Defendant maintains facilities and business operations in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

27.     Plaintiffs timely filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). On or about December 14, 2018, the EEOC issued Plaintiffs Notices of Right to Sue.

28.     Plaintiffs have timely filed this action and have complied with all administrative prerequisites to bring this lawsuit.

## FACTUAL BACKGROUND FOR KSENIA SHNYRA

### Summary

29.     By any objective measure, Dr. Shnyra was an outstanding employee and manager during her tenure as a senior executive at State Street. In the course of her employment with State Street, Dr. Shnyra had regularly received higher than average performance ratings and significantly contributed to the Bank's bottom line.  Yet, State Street paid Dr. Shnyra less than her male colleagues who had lower performance ratings and failed to reach their revenue targets and mistreated Dr. Shnyra as well as reprimanded for actions that were tolerated—indeed encouraged—in her male counterparts.

30.     When Dr. Shnyra submitted several complaints about gender discrimination against and repeatedly pressed the Bank to launch a formal investigation into these mistreatments, State Street (a) effectively ignored and/or minimized Dr. Shnyra's complaints and actively discouraged her from pursuing them; (b) attempted to manufacture conditions to terminate Dr. Shnyra "for cause"; and (c) most outrageously, when all else failed, disbanded an entire unit within the Bank, headed by Dr. Shnyra to cover up her wrongful termination.  In the course of such egregious misconduct, the Bank violated a whole host of federal, state and local anti-discrimination, employment and labor laws, as well as its own policies.

31.     Dr. Shnyra sought to resolve her dispute with State Street, in good faith and out of court, but the Bank's complete lack of response left her no choice but to file a charge with the Equal Employment Opportunity Commission ("EEOC").   Following an 11-month EEOC investigation, that was rife with delays and mishandling of crucial files, Dr. Shnyra now brings this discrimination case.

## State Street Wrongfully Persecutes Dr. Shnyra,
## its Star Executive, Simply for Being a Woman

32.     At the time of her wrongful termination, Dr. Shnyra was a top performer (based on her annual and mid-year performance evaluations) and a valuable employee of State Street's Global Exchange division ("SSGX" or "GX"), earning in excess of $420,000 per year in 2016 in salary and performance-based compensation commission.

33.     In conjunction with her demonstrated success, Dr. Shnyra also held an equity interest worth nearly $110,000 and a deferred cash award of $188,000.

34.     While at State Street, Dr. Shnyra had built, from the ground up, an entirely new unit within SSGX, Enterprise Risk Advisory Services ("ERAS").  With her leadership, the ERAS group emerged as a powerhouse within State Street, with annual revenues in excess of $6 Million.   Throughout Dr. Shnyra's stellar tenure at State Street, her group had remained the most profitable advisory business in Innovation and Advisory line of SSGX, as per monthly accounting reconciliations and comparisons against the business lines.

35.     Year after year, Dr. Shnyra worked hard to drive excellent results at ERAS, which grew from a 2-person shop, in the beginning, into a high-performing group with 17 employees by early 2017.

36.     From March of 2016 to May of 2017 (or just months before her wrongful termination), Dr. Shnyra lead the execution of Operational Deposit ("OD") project[1], a critical endeavor which allowed the Bank to reclassify over $22 Billion of its clients' deposits, in turn, resulting in about $220 Million of permanent saving to State Street, annually.

---

[1] The full description of the OD project was Operational Deposits Model for Global Liquidity Risk Management team within State Street Treasury.

37.     At the time, the then Treasurer, John Slyconish, personally lauded Dr. Shnyra for her efforts, saying that she embodied "core State Street values."  Indeed, just two months prior to her abrupt termination, another senior executive, Lou Maiuri (then the head of both SSGX and SSGM and currently State Street's COO), commented just how valuable ERAS and Dr. Shnyra were to the success and strategic vision of State Street.  And two months prior to that, the president of State Street, Mike Rogers, invited Mr. Reyngold and Dr. Shnyra for lunch to celebrate the success of the OD project.

38.     Dr. Shnyra personally led the OD work as a subject matter expert and execution manager.  Dr. Shnyra's work allowed State Street to free up a substantial amount of capital for better investment opportunities, in the process increasing the Bank's Net Interest Income. The OD project's success directly factored into pushing State Street's stock price to a historical high once the Bank applied the new methodology, developed and implemented by Dr. Shnyra.

39.     Implementation of the model developed under Dr. Shnyra's supervision and guidance further helped State Street to retain its core business of custodial clients, across the globe. The Bank faced a significant reduction of clients' deposits and other core business due to the unfavorable LCR treatment under its prior operational deposits model. The loss of deposits base was so severe that State Street instituted special projects and initiatives to retain clients globally, often having to offer monetary incentives.

40.     Given Dr. Shnyra (and ERAS's) remarkable and continued success, State Street could not possibly have any legitimate business reason for Dr. Shnyra's abrupt termination and the dismantling of her entire unit.  Instead, Dr. Shnyra's wrongful termination came at the end of a drawn-out, manipulative, intentional and despicable course of conduct engaged in by State

Street and its highest-level officers and employees, including division heads and human resources specialists, or the very people charged with protecting Dr. Shnyra.

41.     Practically, it was a campaign designed to break a woman financially, emotionally and, in the process, try to claw back the substantial equity and deferred cash interest Dr. Shnyra had earned over the course of four years of hard work. State Street also stripped Dr. Shnyra of a material portion of her performance-based compensation for 2017, which, based on the previous year comparison and Dr. Shnyra's unit (ERAS) exceeding its revenue target, would be valued at $150,000 in cash and $50,000 in equity stake (and not $100,000 offered to her as a Special Severance Payment)[2].

42.     Legally, it was a campaign of gender discrimination, retaliation, violation of equal pay and wage laws, harassment, verbal abuse and breaching express and implied covenants of good faith and fair dealing with an employee, especially an employee of Dr. Shnyra's caliber.

43.     State Street unceremoniously and abruptly threw out Dr. Shnyra—despite four years of hard work and determination; despite establishing a new sustainable line of business for the Bank; despite fulfilling multiple regulatory obligations; despite leading a project (Operational Deposits) that resulted in record-level appreciation of State Street's stock; and despite realizing material cost savings to the Bank, extending far beyond Dr. Shnyra's tenure at the Bank.

---

[2] Dr. Shnyra's performance compensation was implicitly connected to the sales and revenue generation and establishing a pipeline of work. As evident from the executed statements of work, all execution contracts were prepared by and addressed to Dr. Shnyra directly. All of the revenue targets for the business unit in 2017 were met, with execution work booked up until September 2018 to sustain business unit's activities and revenue margins. In consideration of the facts above, withholding any portion of such performance-based compensation was willful wrongdoing on behalf of State Street.

44.     There is overwhelming evidence that State Street:

(a)     labored under a double standard, treating Dr. Shnyra differently from the Bank's male managers, both, financially and professionally;

(b)     unlawfully terminated Dr. Shnyra on the basis of her gender and in retaliation for previously filed complaints of gender discrimination and other protected conduct; and

(c)     manufactured pre-text reasons and took painstaking steps to hide this illicit decision as part of supposedly "strategic" disbanding of the entire group headed by Dr. Shnyra (the aforementioned ERAS), which, in fact, had no business purposes whatsoever.

45.     The chain of events and official misconduct by State Street executives, summarized in a chart that is annexed herewith as **Exhibit 1**, makes it abundantly clear that, State Street desperately wanted to get rid of Dr. Shnyra and was willing to go to great lengths (including manufacturing a massive but entirely unnecessary "pre-audit" detailed below) to accomplish and cover up this illicit goal.

46.     With this egregious misconduct, State Street violated numerous federal, state and local anti-discrimination, employment and labor laws,[3] the covenant of good faith and fair dealing with its employees as well as the Bank's own rules and policies governing separation and transition.

### Dr. Shnyra Experiences Discrimination
### at State Street Well Before Her Wrongful Termination

47.     Even before Dr. Shnyra's wrongful termination and the events leading up to it, Dr. Shnyra had experienced many instances of disparate treatment on the basis of her gender.

---

[3] These laws already include Title VII of the Civil Rights Act of 1964, Older Workers Benefit Protection Act ("OWBPA"), Worker Adjustment and Retraining Notification ("WARN") Act, New York State WARN Act, New York State Human Rights Law ("NYSHRL")  and New York City Human Rights Law ("NYCHRL").

48.     Despite Dr. Shnyra's excellence and continued success, she was the lowest base paid Managing Director in ERAS.  Specifically, Dr. Shnyra was underpaid $25,000 - $30,000 annually (or between 17-20% of base compensation), according to market research and analysis of the base pay of the other Managing Directors in ERAS.  Notably, this gender gap was consistent with the most recent data from the U.S. Bureau of Labor Statistics: women in Dr. Shnyra's age category (35 - 44 years old) earned, on average, 17% less than their male counterparts[4].

49.     Moreover, throughout Dr. Shnyra's tenure at State Street, there were specific instances where State Street clearly discriminated against her in pay and promotional opportunities, on the basis of Dr. Shnyra's gender.

50.     In 2015, in the course of the company-wide reorganization of management titles and positions, Dr. Shnyra was passed over for the "Managing Director" position ("MD") in favor of a more junior, less experienced, and financially non-performing male executive, Shota Ishii. And when Dr. Shnyra' was eventually promoted in 2016, State Street required her supervisor to submit to the committee a full promotion file with a number of recommendations, by far a more difficult process than a simple retitling that was applied to Mr. Ishii above.

51.     These decisions had real consequences in power structure and pay.  After Dr. Shnyra's eventual promotion to a Managing Director, at the time when her performance rating was the highest possible given the Bank's rating scale, Dr. Shnyra's salary increased by 15%, yet

---

[4]https://www.aauw.org/aauw_check/pdf_download/show_pdf.php?file=The-Simple-Truth

still put her, as a MD, below the compensation paid to *more junior but male* members of Dr. Shnyra's own team, who reported to her.

52.     According to the information provided by the compensation team, with three graduate degrees in scientific disciplines and 16 years of professional experience, Dr. Shnyra still received a salary increase that put her below the 25th percentile of the Managing Director compensation band and below the 75th percentile of the compensation for the Vice Presidents at State Street.

53.     There was even a more egregious and notable incident of discrimination.  In 2016, Dr. Shnyra led a successful challenge to the compensation structure, in the form of salary bands within her group, which was woefully uncompetitive in the market for the type of talent and experience needed at ERAS at the time.  Remarkably, even though Dr. Shnyra' prevailed overall, her own salary increased the least, as against the rest of ERAS.  Compared to everyone else who had received a raise due to her efforts, Dr. Shnyra's base compensation increased only by 9.3 %, while an average rise in ERAS overall was 19.7%, even though she was already starting from a compensation level that was significantly lower than other MDs.

54.     State Street criticized Dr. Shnyra's behavior that the Bank would—and did— readily accept from her male colleagues and used it against Dr. Shnyra in repeated attempts to get rid of her.

55.     From State Street's actions and collective attitude, bogus "conclusions" (or rather lack thereof) to the investigations conducted by its Human Resources ("HR") department, as well as attacks that were staged by HR and senior management, it is clear that a woman is not permitted to act like a man at State Street.

56.     As a woman, Dr. Shnyra could not engage in constructive criticism, raise legitimate professional challenges, demand results in an agreed-to timely fashion or file gender discrimination complaints for company's review, in good faith and in accordance with State Street's own policies.

57.     In the period immediately preceding her termination, Dr. Shnyra had made several serious complaints of gender discrimination against her.  Yet, State Street repeatedly failed to respond, in any meaningful manner, and made concerted efforts to sweep under the rug Dr. Shnyra's legitimate complaints. HR employees responsible for investigating Dr. Shnyra's complaints failed to follow up on the results of the investigations twice; attempted several times to intimidate Dr. Shnyra through harassment and wholesale fabrication of facts.  One such episode of harassment and fabrication was so egregious that the offending HR employee was terminated—but only after Dr. Shnyra filed a formal objection with that employee's supervisor.

58.     Instead of keeping Dr. Shnyra abreast of the investigations, sharing the results and moving quickly to address her concerns, State Street left Dr. Shnyra in total darkness: no transparency, no good faith, no guidance on the impact of Dr. Shnyra's complaints on her career progress and standing with senior management.  This deliberate black-out persisted, despite Dr. Shnyra repeatedly raising concerns and asking questions.

59.     In one of her communications, Dr. Shnyra raised concerns about "being a victim of any stigma that may be associated with the gender bias complaints or labeled as a troublemaker in the broader organization."  No one at State Street responded.  Yet, in a remarkable turn of events, Bank's senior management would later throw Dr. Shnyra's comments back at her.  Dr. Shnyra's supervisors (all men) pegged her as "a troublemaker," for no reason

other than Dr. Shnyra being a woman, and harassed her—precisely the result Dr. Shnyra wanted to avoid.

60.    One would expect that State Street's reprehensible conduct would stop the minute Dr. Shnyra lodged her gender discrimination complaints.

61.    Incredibly, however, State Street ratcheted up its mistreatment.   The Bank doubled down with each of Dr. Shnyra's complaints and requests for support from HR (for instance, to provide her with "HR advocate") that she made during her continued mistreatment. Dr. Shnyra's requests to provide an independent advocate to avoid character assassination were deflected upon by responsible parties within HR and management. At the time when she was requesting an HR advocate, Dr. Shnyra had also approached several senior executives with her concerns.  Off the record, these executives all indicated that" they have to believe that HR will protect" Dr. Shnyra.  In the open, however, no one lifted a finger to make sure that HR would provide the support Dr. Shnyra requested.

62.    Before wrongfully terminating Dr. Shnyra in a truly unprecedented fashion detailed below, State Street first tried to manufacture a pretext for Dr. Shnyra's "termination for cause" by inventing a phantom "pre-audit" project[5]  and starving her group of staff desperately

---

[5] This made-up and wholly unnecessary "pre-audit" lasted 4 times longer than initially anticipated, diverted substantial resources and required several hundreds of pages of documentation to be furnished in a period of some four weeks. By contrast, the Bank permitted similarly situated business units to submit substantially less supporting documentation and required remarkably fewer number of hours and meetings for similar type of activities, despite much higher risk profile of the other units. The fact that this bogus "pre-audit" was started one month prior to Dr. Shnyra's termination and completed just one day before she was abruptly terminated, clearly shows that its true purpose was to overburden Dr. Shnyra with "busy work," which had no business or other use whatsoever, and ultimately push her out of the Bank.

needed to replace the vacated positions—let alone the additional staff to comply with the fake "pre-audit."

63.     Senior management within Dr. Shnyra's division, GX, delayed the processing of previously approved employees for ongoing projects; some of these delays were over six months. At the same time, GX management also sought to increase agreed-to annual revenue targets (remarkably, due, in part, to non-performance of other groups within GX), without even providing the capacity to meet the existing revenue targets, in the first place.

64.     Dr.  Shyra's managers continuously harassed her and demanded that she work outside of typical working hours, requesting work during the weekends, public holidays, and otherwise piling on Dr. Shnyra well beyond what is considered normal even in the financial industry, notorious for its long hours.  They also wanted to impose, several times a so-called "stretch revenue" on ERAS: i.e. increase in revenue for ERAS to compensate for less-performing group in the middle of the year and whiout ERAS's management consent.  One of Dr. Shnyra's supervisors, John Plansky (a central figure to be profiled later), during one of his verbal attacks, explicitly told Dr. Shnyra that he "does not care whether" she had to "work ten hours or twenty hours;" Dr. Shnyra had to "comply with the requirements" that Mr. Plansky continued to invent on the fly.

65.     After State Street had exhausted all attempts to fabricate "termination for cause" and push Dr. Shnyra out the door, the Bank resorted to a truly desperate and despicable course of conduct.  State Street terminated Dr. Shnyra on the grounds of strategic disbanding of the entire group headed by her (ERAS), which as will be shown below, had no real business rationale.  As multiple senior executives, including Mr. Lowry, Mr. Maiuri, and Mr. Plansky publicly reassured

Dr. Shnyra several times, SSGX continued to view ERAS as a strategically important and relevant business unit set for further growth over the next three years.

66.    Even the "official" rationale that State Street had given, initially, for the dismantling of Dr. Shnyra's entire group contained several contradicting statements. The ostensible reason communicated verbally to one group of employees (those under 40 years old) was that Dr. Shnyra's group was no longer "strategically relevant."  Yet, in the severance papers received by other employees, (40 years and older) the Bank stated that wholesale dismantling of ERAS supposedly was based on "a broad range of variably weighted criteria[,] . . . includ[ing] each's professional background, employment history, and job performance, as well as his or her technical, managerial, and leadership skills, work productivity, demonstrated commitment to teamwork and overall attitude, client relationship, educational and professional achievement, and time in the job."

67.    Notably, when challenged by several members of ERAS on the reasons for the dismantling of Dr. Shnyra's entire group, State Street admitted, among other things, that the Bank "did not accurately describe rationale" for this momentous decision.  Even then, State Street continued its pattern of discrimination against women.  Though State Street admitted its errors— it did so only with respect to the *three male* employees of ERAS, Mr. Reyngold, Mr. Walker, and Mr. Savage.  The Bank never even responded to the *two female* employees—Dr. Shnyra and another member of her group, Yang Li—who had made similar inquiries and sought relevant information and documents regarding these very issues.

68.    Equally of note, even while claiming that ERAS was no longer relevant for its business,  State Street was quietly trying to reassign the displaced employees from Dr. Shnyra's

unit to other groups within the Bank.  Yet, this had gone on in a haphazard manner, and certainly without any apparent objective non-discriminatory reasons.

69.     At least five former employees within ERAS (Peiyu Rang, Zhanyang Xue, Weizhe Tao,   Yunqing Hu, Yu Chi Kuo) were offered reassignment into positions that were posted on October 23, 2017, or shortly after Dr. Shnyra was terminated and ERAS dissolved. Two of these employees had below average mid-year performance rating; one had a long record of insubordination, absenteeism and terrible work ethic.

70.     Reassignment of these ex-ERAS employees would lead to retention of less experienced and low-performing staff over more experienced and better-performing employees. Notably, the only former ERAS employees *not* offered reassignment were Dr. Shnyra, Mr. Reyngold, and Mr. Walker, as there were no corresponding positions posted for the MD level candidates at the time.

71.     In short, State Street's decision to terminate Dr. Shnyra and engage in a massive cover-up of that decision was made on the basis of her gender; in retaliation for her protected conduct; and out of real fear that Dr. Shnyra would discover these outrageous misdeeds and act to vindicate her rights.

72.     Moreover, State Street had every incentive to backpedal on the investigations that should have followed Dr. Shnyra's complaints; bury results of these investigations; and nip in the bud all of Dr. Shnyra's efforts to learn about the results of her complaints: after all, one of Dr. Shnyra's harassers was the Global Head of SSGX,  John Plansky.   Sweeping under the rug complaints by a female manager against her high-ranking male executive was part and pattern of the Bank's gender-biased environment and top-down culture.

73.     Even after Dr. Shnyra had escalated her complaints up to the senior management and was subsequently terminated, all she received was a three-minute call, on or about December 12, 2017, from an HR staffer, Erin Toomey, supposedly in charge of investigating Dr. Shnyra claims, who informed Dr. Shnyra that the Bank had found no evidence of any gender-biased misconduct.  Toomey, for no good reason, pointed out that during the course of her investigation she resorted to interviewing "people who did not work with" Dr. Shnyra to somehow establish that "Mr. Plansky had not engaged in gender-biased behavior towards" her.  This was truly startling: how people who had never witnessed Dr. Shnyra's interactions with Mr. Plansky, could say anything about his egregious misconduct against her?

74.     Beyond this brief call, Dr. Shnyra was given no other details regarding the results of the investigation into her complaints, including with respect to Mr. Plansky.  This was remarkable since Dr. Shnyra would eventually become aware that several of her colleagues, including Jessica Donohue, came forward with credible evidence regarding Mr. Plansky's misconduct and questioned whether his outrageous behavior represented company practice in dealing with employees, and in particular female employees.  At the time of the aforementioned call, however, HR did not tell Dr. Shnyra that witnesses interviewed during the investigation had information supporting her claims.

75.     Moreover, the egregious misconduct immediately surrounding Dr. Shnyra's wrongful termination and its cover-up was hardly an isolated instance, but part of a pattern by State Street of completely disregarding the law and mistreating its workforce.   There is ample evidence showing that:

A.     State Street, particularly its HR department, repeatedly ignored and minimized Dr. Shnyra's prior complaints and grossly misinterpreted the law, in the process;

B.     The Bank utterly disregarded Dr. Shnyra's report of a potential conflict of interest inherent in engaging a consulting firm, Oliver Wyman, formerly owned, in part, by State Street's Chief Risk Officer ("CRO") Andrew Kuritzkes;

C.     State Street, through its officers and managers, reprimanded Dr. Shnyra for any constructive challenge of non-functional business processes. Senior management attempted to run Dr. Shnyra out of the Bank through a series of reprimanding acts, reduction of her direct mandate and decision-making. Management and HR were eager to engage in such "character assassination." State Street (i) excluded Dr. Shnyra from relevant business discussions; (ii) denied her right to review financial results of the team performance before distribution to top management; (iii) excluded Dr. Shnyra from communication with her own subordinates on the matters that were under her direct purview, and (iv) ignored Dr. Shnyra's emails with specific questions on the business matters;

D.     State Street has failed to pay its departing employees year-end bonuses, termed "Special Severance Payment," to which these employees were clearly entitled, in knowing a violation of the Bank's own internal policies and procedures. This convenient but unlawful "omission" was not restricted to ERAS, but has been endemic to employees terminated across the Bank;

E.     Even after being exposed for depriving its departing employees of Special Severance Payment, State Street deliberately miscalculated and materially reduced these bonuses in its favor, ignoring the correct calculations presented by its recently terminated employees. Notably, and to no one's surprise, even in this case State Street tried to swindle its female employees out of more money than their male counterparts: the Bank offered one of its female employees about 30% of the expected Special Severance Payment, as compared to about 50% of this bonus to a similarly situated male employee. In another example of disparate treatment, it even decided not to provide the female employee with the basis for calculating her bonus, while readily disclosing the same information to her male counterpart;

F.     The Bank apparently has filed no notices with New York State Department of Labor ("DOL"), as mandated by the New York WARN Act, for any reduction of the workforce ("RIF") implemented from 2012 to 2017. Remarkably, many of State Street's competitors, which include a large number of Tier 1 banks with locations in New York State, regularly file these mandatory notices with DOL, when initiating any workforce reduction; and

G.     State Street has a history of significantly underpaying its female employees, which became public just as the Bank was scheming to get rid of Dr. Shnyra.

76.     In one of the numerous examples of reprimands to Dr. Shnyra, the Head of SSGX's North America operations and one of State Street most senior executives, James R. Lowry, directed Dr. Shnyra to "dial back the rhetoric in your emails. It's not the way you should

be treating your colleagues" when she merely pointed out deficiencies in the critical business process of contractual review by GX's legal department (notably, GX's Chief Operating Officer had agreed and acknowledged such deficiencies in writing in response to Dr. Shnyra's earlier email).

77.     Yet, when investigating Mr. Plansky's mistreatment of Dr. Shnyra, HR somehow found "no evidence of harassment and hostile work environment" where, in fact, Mr. Plansky repeatedly hurled verbal abuse and attacked Dr. Shnyra, using threats like "shut up and listen," "you need to get out of State Street" and equally abusive language in his one-sided conversations with Dr. Shnyra.   In concluding its bogus investigation with "no evidence," HR apparently ignored the facts that Mr. Plansky's attacks caused Dr. Shnyra to suffer stress-induced anaphylactic shock, that she had to undergo emergency treatment with steroids and started to experience PTSD symptoms, as attested by Dr. Shnyra's treating physician.

78.     At every turn, as evidenced here, State Street criticized any assertive behavior from Dr. Shnyra, as a female manager, even as the Bank accepted, as a norm, far worse hostile and harassing behavior from her male colleagues, as evidenced in the case of Mr. Plansky, laboring under a double standard/gender stereotyping.

79.     In another concrete example of mistreatment and retaliation, State Street began excluding Dr. Shnyra from regular progress meetings on the aforementioned Operational Deposits ("OD") project.

80.     Despite being excluded and to no one's surprise, Dr. Shnyra's expertise was still vitally necessary for these meetings.   Indeed, one of State Street's most senior managers, Jessica Donohue, continued to channel to Dr. Shnyra critical documents and information from the

progress meetings, to solicit her expert feedback and opinion. This after Ms. Donohue's repeated requests to include Dr. Shnyra in the meetings were denied.

81.     As it turns out, excluding Dr. Shnyra from the progress meetings led to inaccurate information being fed to the senior management and State Street's President, on the timeline for the implementation of the OD project. Dr. Shnyra raised this misinformation to the members of the senior committee and—despite considerable pressure applied on her directly by State Street's Treasurer, John Slyconish, requested and succeeded in extending the expected date of implementation of the OD project by one month to allow for proper testing with various technology teams.

82.     Notably, during the additional testing time requested by Dr. Shnyra, State Street identified and was able to remedy several deficiencies and additional scope of work, critical for successful implementation of the OD project. Remarkably, Dr. Shnyra needed to withstand significant pressure from the treasury department and global liquidity risk management team to ensure that her concerns were given the attention they deserved from the senior management.  In the process, Dr. Shnyra's professional and personal reputation were assailed; she was besmirched as "dishonest" about the information provided to the management, further raising Dr. Shnyra's concerns about her mistreatment.

83.     Through it all, Dr. Shnyra remained technical lead and execution lead on the OD project for eight more months until the model she had developed was approved by the Federal Reserve, went through testing and validation and was finally implemented. Well beyond that, almost to the end of her tenure at State Street, Dr. Shnyra continued to directly interact with the Federal Reserve and State Street's internal model risk oversight group on the topics related to the technical and business rationales of the OD project.

84.     Even as the senior management at State Street grudgingly accepted Dr. Shnyra's input, they continued to view and treat her as an unwanted upstart.

85.     During one of the discussions on the OD project, State Street's Chief Risk Officer ("CRO"), Andrew Kuritzkes, expressed dissatisfaction that "some girl from Brooklyn" was able to find billions of dollars overlooked by senior risk professionals.

86.     Despite facing increasing isolation and discrimination, Dr. Shnyra continued to provide valuable input.  She was the one  who pointed out, during the meeting with State Street's President and department heads, that CRO would need to revise the Bank's risk limits and expedite simulation analysis, within the next three months,  to ensure that the freed up cash can be allocated appropriately without adverse effect of moving the market.

87.     At the time these events took place, Dr. Shnyra held three graduate degrees (MS in Economics, MBA in Finance and CIS, and Ph.D. in Finance) and had been one of the most qualified STEM employees in the entire Bank. She also had significant experience as a financial professional and expert economist, having to conduct negotiations with Heads of States and high-ranking officials during her tenure in Russia as a Deputy Chief of Financial Planning and Analytics. Dr. Shnyra had extensive quantitative, research and implementation experience working as a technical lead on multiple risk management projects with Tier 1 Banks, globally.

88.     That a senior officer at State Street, like Mr. Kuritzkes, would stereotype Dr. Shnyra as "some girl from Brooklyn" was but another instance in a pattern of mistreatment of the Bank's female talent.

### Dr. Shnyra Excels at State Street

89.     Dr. Shnyra started working at State Street on January 31, 2014.   During the relevant period, she was promoted to the position of a Managing Director with State Street's Global Exchange division.   In the course of her tenure at State Street, Dr. Shnyra was consistently ranked high in her professional abilities by her colleagues and superiors, always receiving "Exceeds Expectations" and "Often Exceeds Expectations" ratings during her annual performance evaluations, as well as favorable feedback from clients and colleagues.   Dr. Shnyra also had one of the highest ratings as a manager comparing to peers and average in the organization.

90.     Dr. Shnyra was responsible, together with Alexander Reyngold, for launching an entirely new line of services at State Street, the aforementioned ERAS, eventually becoming ERAS' head of execution.   In that position, Dr. Shnyra carried a wide range of responsibilities that included, *inter alia*, selling, negotiating and preparing contractual work for ERAS' clients; leading group execution work; providing subject matter expertise; timely production of contractual deliverables that typically consisted of analyses and methodologies for assessing and implementing various regulatory requirements imposed by the Federal Reserve, Securities and Exchange Commission ("SEC"), Federal Deposit Insurance Corporation ("FDIC") and other agencies charged with regulating State Street.

91.     Due in large measure to Dr. Shnyra stellar efforts,   ERAS performed well financially.

92.     The ERAS team grew significantly from 2 employees (namely, Dr. Shnyra and Alexander Reyngold) at the unit's inception, to 17 employees and managers in early 2017.

Indeed, as late as July 2017 (or less than 3 months before the entire group would be dissolved!), State Street officially projected the ERAS team to grow to 32 employees by 2020.

93.     ERAS consistently met and often exceeded revenue targets and was entrusted with some of the most significant projects within its division, GX, and the Bank overall.  Dr. Shnyra regularly took part in meetings and discussions with internal and external oversight bodies. By the nature of her job requirements, Dr. Shnyra maintained up-to-date knowledge of the relevant regulations; possessed tremendous financial, analytical and project management skills, and frequently presented to senior stakeholders internally and externally, in a well-balanced matter, on the progress and issues of her work.

94.     Notably, just prior to State Street's decision to terminate her and as previously discussed, Dr. Shnyra was charged with the execution of a top-priority project (the aforementioned OD project) that was under the direct purview of State Street's then President and Chief Operating Officer, Michael F. Rogers. Dr. Shnyra was also responsible for the execution and design of model risk management program for overall State Street Global Markets that was required by the Federal Reserve.

95.     During her tenure, Dr. Shnyra regularly held meetings with State Street's CRO, Andrew Kuritzkes, the Bank's Treasurer, John Slyconish, Global Head of Liquidity, Ricardo Crumble and Li Ma, Head of State Street Global Markets, Louis Maiuri, and other senior executives.  Dr. Shnyra often spoke as an industry expert and served as a course instructor at various industry events.

96.     State Street's Head of Innovation and Advisory, the aforementioned Jessica Donohue, sent Dr. Shnyra a note where Ms. Donohue that she has "*never seen such dedication –* to her staff, to her colleagues, to the work and the *truth."*

97.     As late as April 28, 2017, State Street's Treasurer and other members of the Bank's executive management team recognized Dr. Shnyra as an individual that "truly embodied State Street's key goals to 'Drive our Strategy' and Collaborate for Results.'" In his email, State Street's then-Treasurer emphasized that "[d]eployment of the new operational deposit model resulted in an increase of ~$20BN in operational deposits and a significant increase in our capacity to deploy strategies to grow our net interest revenue."

98.     In sum, Dr. Shnyra was a valued, highly qualified and experienced employee and manager at State Street.  The Bank's decision to terminate Dr. Shnyra and her entire unit came as a complete shock to Dr. Shnyra and her colleagues at ERAS.  From the outset, Dr. Shnyra has been convinced that her termination was utterly unrelated to her or ERAS's performance or any other legitimate business reasons.

**Dr. Shnyra Repeatedly Encounters and
Complaints About Gender Discrimination**

99.     There is ample evidence that State Street decided to terminate Dr. Shnyra in response to her repeated complaints of gender discrimination.  Remarkably, the Bank turned deaf ears to these complaints, took active measure to sweep them under the rug, and failed to share results of its "investigations" (which were never undertaken in earnest).  Even more egregiously, State Street went to great lengths and engaged in all kinds of illicit conduct to cover up Dr. Shnyra's wrongful termination.

*Dr. Shnyra's Mistreatment by an HR Recruitment Supervisor*

100.     Dr. Shnyra's first encounter with the disparate treatment of female staff came during her dealings with State Street's HR department.

101.    In her position as a Managing Director and head of execution at ERAS, Dr. Shnyra frequently interacted with HR in connection with the hiring and retention of staff for her unit as well as various onboarding issues. For most of her tenure at State Street, these responsibilities from within HR fell on Dana Hopkinson, one of the HR recruiters based out of the Bank's headquarters in Boston and working with ERAS's overall division, GX.

102.    Mr. Hopkinson, from the outset, treated Dr. Shnyra differently from what she had witnessed his treatment of other, male, employees.  This disparate treatment ranged across a wide variety of core HR functions.  Among other things, Mr. Hopkison:

(a)     refused to consider changes in some hiring practices, e.g., the language in Dr. Shnyra's offer letter, suggested by Dr. Shnyra; yet, readily accepted virtually the same suggestions from two of her male colleagues;

(b)     used demeaning language and threats (overt and veiled) in his communications with Dr. Shnyra and a female external recruiter, while never permitting such language in communications with male colleagues and associates;

(c)     would often withhold from Dr. Shnyra crucial information that impacted the hiring process, causing unnecessary delays; on information and belief, he never withheld such information from Dr. Shnyra's male counterparts;

(d)     would wait to receive approval for hire from a male supervisor, even when a female supervisor had already approved the same hire.

103.    Dr. Shnyra repeatedly reached out to Mr. Hopkinson's supervisors at HR, first less formally in phone conversations.  Notably, one of such calls was attended by GX Head of North America, James R. Lowry, who was fully apprised of the situation. Dr. Shnyra also attempted to approach Mr. Hopkinson, directly, with her concerns.

104.    However, even after repeated pleas and escalation to senior management, Dr. Shnyra received no real response or corrective actions from HR in connection with her complaints. She also never received any response from Mr. Hopkinson, directly, with respect to the concerns that Dr. Shnyra openly shared with him.

105.     On or about June 27, 2017, Dr. Shnyra made a written report to HR regarding Mr. Hopkinson and requested that the Bank launch an official investigation into her complaints.

106.     Even Dr. Shnyra's formal complaint resulted in a single phone call from an HR representative, Joy Murray, which took place on July 13, 2017.

107.     Remarkably, Ms. Murray was not interested in gathering facts for a proposed investigation, but to try to convince Dr. Shnyra that her complaints were unfounded.  Indeed, Ms. Murray was overtly dismissive of Dr. Shnyra's concerns and used language that Dr. Shnyra found demeaning and insulting, particularly due to the sensitive nature of her complaint.  Ms. Murray rudely interrupted Dr. Shnyra, on several occasions, to tell her that, due to shortness of time, they needed to move on to other topics.

108.     Notably, Ms. Murray promised to follow up and get back to Dr. Shnyra shortly but never did—until after Dr. Shnyra left State Street's employ, months later.  Even then, Ms. Murray were merely a silent participant in a conference call with Dr. Shnyra and another, more senior, HR staffer, Erin Toomey.  Knowing that this was likely the last opportunity to share with Dr. Shnyra the results of HR's purported "investigation" into Mr. Hopkinson, Ms. Murray (and Ms. Toomey) said nothing on that issue.

109.     State Street's failure to address Dr. Shnyra's complaints about Mr. Hopkinson was particularly troubling given his prior history of race and age discrimination.

110.     On information and belief, Mr. Hopkinson led a distressing campaign that resulted in the loss of employment for Keith Dondl, a single father of two, who was seeking a position within Dr. Shnyra's group.

111.    Mr. Hopkinson had initially cleared Mr. Dondl for hiring, but then, with onboarding virtually underway, suddenly reversed course claiming that Mr. Dondl did not pass the background check and had issues in his credit history.  When it turned out that the credit issues had been fixed, HR switched to claiming that Mr. Dondl was somehow "dishonest" during the Bank's continued investigation and background checks.

112.    This sudden about-face shocked conscience: Mr. Dondl was eminently qualified for the position he was seeking; had disclosed entirely his financials and other aspects of his background; last but not least, the position Mr. Dondl was seeking had nothing to do with providing financial advice and thus did not implicate his personal finances in any way.  On information and belief, there was every reason to believe that the issues with Mr. Dondl hiring were orchestrated by Dana Hopkinson, who was in charge of handling Mr. Dondl's hire.

113.    Mr. Hopkison was also responsible for almost torpedoing and, ultimately, substantially delaying the hiring of Kenneth Walker, an experienced executive, who was equally qualified for the position he was seeking within Dr. Shnyra's group and whose hiring (like Mr. Dondl's) Dr. Shnyra strongly advocated.  Mr. Hopkinson—again, late in the process and for no good reason—objected to the hiring of Mr. Walker.  On information and belief, Mr. Hopkinson's objections were motivated by Mr. Walker's age—at the time of his hiring, Mr. Walker was 62-years old, a fact on which Mr. Hopkinson focused expressly during the hiring process.

114.    Dr. Shnyra followed up on her written complaint with emails to HR supervisors, but no one appeared to take her concerns seriously.  On information and belief, as of December 2017, when Dr. Shnyra was being wrongfully terminated, Dana Hopkinson was still with State Street and had not been demoted, disciplined or reprimanded.

*Senior Managers Single Out Dr. Shnyra and*
*Deliberately Create Conditions for Her Termination*

115.    Beyond her dealings with Mr. Hopkinson, Dr. Shnyra continued to experience disparate treatment and even harassment at the hands of the senior management at State Street. It started with a change in part of the GX management team in or about January 2017, when John Plansky was named an Executive Vice President ("EVP") and Global Head of GX, replacing Louis Maiuri, and (2) James R. Lowry was named Senior Vice President and Head of North America operations at GX, replacing Jessica Donohue in that role.

116.    Notably, prior to their placement in new management positions, Messrs. Plansky and Lowry had gone on the record to praise Dr. Shnyra's work at State Street.

117.    Things changed abruptly and for the worse when Mr. Plansky and Mr. Lowry became Dr. Shnyra's direct supervisors. Dr. Shnyra's responsibilities were dramatically reduced: she was removed from all decision-making activities within ERAS, even though she continued to be tasked with the execution of the contractual deliverables.

118.    In particular, Dr. Shnyra was no longer involved in validation of ERAS' financial projections; she was no longer included in high-level strategy meetings, and no longer had any input into the hiring and other staffing decisions or IT support issues.  All of these were critical parts of management deliberations and decision-making that impacted directly ERAS' ability to execute on deliverables—and thus substantially hampered Dr. Shnyra's ability to do her work.

119.    Throughout 2017, virtually from the time of the aforementioned regime change, Dr. Shnyra repeatedly raised with Messrs. Lowry and Plansky substantial issues, via emails and in meetings, which negatively impacted ERAS' performance.  None of Dr. Shnyra's concerns were seriously considered.  Indeed, it appeared that the senior managers' complete lack of

response, or even interest in learning about ERAS, was setting up Dr. Shnyra and ERAS for failure.

120.    Unfortunately, Dr. Shnyra's worst fears regarding her mistreatment were proven true.

121.    In late June 2017, Mr. Lowry asked Dr. Shnyra to serve as the point person at ERAS for an internal audit that was to precede the planned comprehensive audit review of Dr. Shnyra's group, which in turn was to be a part of the overall advisory business audit of GX.

122.    Remarkably, neither Mr. Lowry nor anyone else at State Street ever gave Dr. Shnyra a legitimate purpose for this so-called "pre-audit," except for Mr. Lowry's off-hand remark: "I have decided that this is how we will proceed with audit preparations."

123.    Moreover, as Dr. Shnyra would subsequently learn, the "pre-audit" of _her_ group was slated for an extraordinarily long time as compared to _other_ units within GX.  ERAS' "pre-audit" was scheduled for at least eight meetings across multiple departments and interested parties. Other units' "pre-audits" would take a couple of hours.

124.    Dr. Shnyra promptly requested a meeting with the Bank's appointed internal auditor, ahead of time, to ensure that there is sufficient time to clarify the applicable scope with the audit and provide details on the business specific risk mitigants that may not be apparent when comparing ERAS to other GX business units.  For the rest of June and July of 2017, Dr. Shnyra repeatedly followed up on this request for a meeting with the auditor, literally dozens of times.  Each time, however, her request was denied.

125.    Eventually, John Plansky informed Dr. Shnyra that the "pre-audit" would be headed by Brenda Curran, a senior executive at GX who, as Dr. Shnyra was given to understand, reported directly to Mr. Plansky.

126.    Mr. Plansky assured Dr. Shnyra that Ms. Curran would be arranging a meeting with an actual auditor assigned to this project, Robert O'Reilly, to ensure that the work on the pre-audit would align with the scope expected by the actual independent internal auditor.  Non-surprisingly, Dr. Shnyra never was given the opportunity to discuss the scope of anticipated preparations directly with Mr. O'Reilly.

127.    Ms. Curran would not contact Dr. Shnyra until the end of August 2017. Remarkably, Ms. Curran canceled the agreed-to (and already scheduled) meeting with the actual auditor, and never re-scheduled it.

128.    The ostensible reason Ms. Curran had given for the "pre-audit" was because _other_ groups at SSGX (though not ERAS) previously received an unsatisfactory grade in the course of their audit, and the SSGX leadership merely wanted to ensure that the audit went well this time around.   Neither Ms. Curran nor anyone else at the Bank had ever disclosed to ERAS any official policy, procedure or guidelines to clarify scope and goals for the "pre-audit." As pre-audit did not include meetings with actual auditors, it was left for Dr. Shnyra and her team to decipher as to how exactly the pre-audit process will help with the actual audit. Rather, from all of the features pre-audit looked more like a search warrant with unreasonable demands on ERAS management and staff.

129.     Indeed, on information and belief, Ms. Curran already had walking orders from Mr. Plansky and Mr. Lowry to find something that could justify Dr. Shnyra's termination or create conditions that would allow State Street to get rid of Dr. Shnyra.  This is evidenced from

the "Confidential" memorandum, dated on or about August 24, 2017, Mr. Curran had supposedly prepared regarding the "pre-audit." This document did not even discuss the results of this bogus exercise. Instead, the memorandum contained scathing ad hominem attacks on Dr. Shnyra and was addressed not only to SSGX executives but, tellingly, to the HR department.

130.    In the meantime, Mr. Plansky had embarked on a campaign of harassment and intimidation directed at Dr. Shnyra. Notably, Dr. Shnyra is not aware of any of her male colleagues ever receiving such terrible treatment.

131.    It was during this period that Mr. Plansky decided (and apparently told Ms. Curran) that Dr. Shnyra was no longer allowed to meet with the actual auditor because of her supposedly "offensive way of showing people that she knows best." Mr. Plansky repeatedly indicated that he was not interested in learning whether there were any deficiencies or better approaches in the process of preparation arranged by Ms. Curran.

132.    Ms. Curran, when questioned separately about scheduling the meeting with the actual auditor, confirmed during a conversation with Dr. Shnyra, that she was concerned with allowing to meet with an auditor because "your behavior could ruin it for all of SSGX and for the acquisitions that John has put into his strategic plan." Dr. Shnyra repeatedly indicated that she had successfully worked with auditors in the past and that Ms. Curran would be able to be at the proposed meeting with this auditor, to oversee it herself. Nonetheless, Ms. Currant did not re-schedule the canceled meeting with the auditor and continued with "pre-audit" efforts without the auditor's input.

133.    Dr. Shnyra also sought additional information and clarification of the "pre-audit" process, from Mr. Plansky and others, for a number of good reasons:

(a)     the "pre-audit" was a novel process for her group;

(b)     at less than four-years-old, ERAS was a relatively new business venture within State Street;

(c)     ERAS' purview was outside of State Street's core business of custodial banking services and products; and

(d)     the assigned pre-auditor, Ms. Curran, appeared not to have any expertise in consulting type of business that ERAS represented or technical aspects surrounding ERAS's projects.

134.    Instead of responding in substance to her queries, however, Mr. Plansky intimidated and threatened Dr. Shnyra with termination, demeaned her, and questioned her professional acumen and loyalty.

135.    These attacks took place and escalated in the course of several in-person and phone conversations Dr. Shnyra had with Mr. Plansky during July - September of 2017.  Indeed, Dr. Shnyra's communications with Mr. Plansky would inevitably and quickly devolve into one-way screaming affairs, with Mr. Plansky using highly inappropriate and profanity-laced language to insult Dr. Shnyra, personally and professionally.   Moreover, Mr. Plansky provided no constructive feedback or could demonstrate at which instance Dr. Shnyra somehow behaved outside of the expectations, denying Dr. Shnyra even an opportunity to explain and defend herself.

136.    Despite the pressure, personal attacks, and hostility from John Plansky, Dr. Shnyra continued to work in good faith to prepare for the upcoming "pre-audit."  Indeed, when Ms. Curran finally contacted her, on August 24, 2017, to set up an introductory meeting, Dr. Shnyra immediately responded and arranged for a long meeting with her and other senior members of the ERAS group.  The initial meeting took place on August 28th and lasted several hours.  Dr. Shnyra thought the meeting was fairly productive and, as is her habit, kept detailed minutes of the meeting to ensure transparency, knowledge accumulation and transfer, as well as

better understanding of "pre-audit" demands.   These minutes were provided to senior management.

137.    Four days after the first meeting with Ms. Curran, on September 1, 2017, Mr. Plansky contacted Dr. Shnyra to schedule an "urgent" call.  During that call, he continued and ratcheted up his harassment.  Instead of discussing the "pre-audit" itself, Mr. Plansky attacked Dr. Shnyra.  He said, offering no specifics, that he received very negative feedback from Ms. Curran regarding her dealings with Dr. Shnyra and her group. Using insulting and demeaning language, Mr. Plansky again questioned Dr. Shnyra's professionalism and commitment, and pressured her to devote a truly exorbitant amount of time to the "pre-audit."  Remarkably, Mr. Plansky did not care whether Ms. Curran's complaints were real; instead, he launched in *ad hominem* attacks, even belittling Dr. Shnyra as "unstable" and a "liability."  Mr. Plansky went so far as to threaten to fire Dr. Shnyra.

138.    Mr. Plansky's attacks were so distressing and demeaning that, shortly following this call, Dr. Shnyra suffered stress-induced anaphylactic shock for which she had to be treated with steroids.  The shock was so deep that the medication dose had to be doubled before Dr. Shnyra started recovering. Indeed, as detailed below, Dr. Shnyra would lapse into, and be diagnosed with, clinical depression and suffer from Post-Traumatic Stress Disorder ("PTSD"), which was obviously caused by her terrible conditions at work.

139.    Dr. Shnyra's treating physician advised her to take a leave of absence from work, but she continued to work at extraordinary pace and hours as Dr. Shnyra wanted to ensure the success of the audit process and was absolutely dedicated to the success of her group.  With ERAS already short two employees to service existing projects and mounting demands of "pre-

audit" work, Dr. Shnyra could not leave her team to be short of one more resource so vitally needed.

140.    On September 5, 2017, or the first business day after Mr. Plansky's harassing call, Dr. Shnyra emailed Mr. Plansky her detailed notes from meeting with Ms. Curran as well as takeaway points and suggestions.

141.    On September 6, 2017, Dr. Shnyra went up to State Street's headquarters in Boston too, among other things, meet in person with Mr. Plansky to discuss the "pre-audit." Notably, the first meeting with Mr. Plansky included Ms. Curran, who appeared without any prior notice to Dr. Shnyra.  In the course of that meeting, it became apparent that whatever concerns Ms. Curran had with Dr. Shnyra and pre-audit were due to misconceptions on Ms. Curran's part, and were not at all Dr. Shnyra's fault.  Immediately, Dr. Shnyra attempted to clear up these errors, ensure transparency and establish clear lines of communications.  Mr. Plansky, however, persisted in pressuring Dr. Shnyra and rejected many of her suggestions.

142.    Ms. Curran was not at the second meeting with Mr. Plansky, which took place on the same day.  At this meeting, Mr. Plansky rebuffed Dr. Shnyra's further efforts to improve the pre-audit process.  Once again, Mr. Plansky threatened to fire Dr. Shnyra for no apparent reason other than his deep-seated anger.

143.    Over the next couple of days following her meetings with Mr. Plansky (and working practically around-the-clock), Dr. Shnyra repeatedly reached out to Mr. Plansky and other supervisors via emails.  In these communications, among other things, Dr. Shnyra:

    (a)    recapped what had transpired up to that point with respect to the "pre-audit," including the fact that its scope far exceeded original understanding;

    (b)    sought further and better guidance from her senior colleagues on the situation;

(c)    requested information and materials that would enable Dr. Shnyra and her unit to understand further and support the pre-audit;

(d)    asked that the Bank promptly find a replacement for two positions within her unit that had gone unfilled for about six (6) months, in light of the additional workload expected of ERAS; and

(e)    made important suggestions to improve the process.

144.    Last but not least, in a separate email to Mr. Plansky's direct supervisor, Louis Maiuri, Dr. Shnyra expressed a deep frustration with the entire situation and raised her concerns with respect to Mr. Plansky's personal attacks on her, which had nothing to do with the quality of Dr. Shnyra's work, and that she was being singled out because of her gender. Dr. Shnyra also clearly indicated that she faced threats of termination and defamation from Mr. Plansky.

145.    These emails went unanswered.

146.    Regardless, Dr. Shnyra continued to work in good faith to support the "pre-audit" process, as is apparent from her interactions with Ms. Curran.

147.    On October 2, 2017, Dr. Shnyra and her group had effectively concluded the pre-audit exercise by providing to Ms. Curran all the information and materials requested and completing all of the questionnaires.

**State Street Attempts to Cover Up Its Wrongful Termination of
Dr. Shnyra As Part of Fictitious "Wind-Down" of Her Entire Unit**

148.    The next time Dr. Shnyra met with Mr. Plansky, he was there to terminate Dr. Shnyra and dismantle her entire group.

149.    On October 3, 2017, Mr. Plansky showed up at the ERAS' New York offices around 10 a.m. to announce that Dr. Shnyra's group was no longer "strategically relevant" for GX and State Street and was being disbanded, with last day of employment for its members slated for December 1, 2017.

150.    Notably, the October 3rd announcement came just one day after the "pre-audit" was completed and a month after Dr. Shnyra had complained about Mr. Plansky's egregious and discriminatory misconduct to his direct supervisor.

151.    Before making this bombshell announcement to the entire group, Mr. Plansky spent several minutes in Dr. Shnyra's office to harass her for the last time.  He expressed no remorse and did not elaborate on the decision to disband an entire unit of State Street.  Mr. Plansky pointedly stated to Dr. Shnyra, without being prompted to do so, that "he was not going to apologize for his decisions."

152.    Mr. Plansky seemed to know next to nothing about ERAS and the group's work when Dr. Shnyra asked him to list the projects and thank employees that were involved in these projects.  He could name only two of the group's projects from a virtual laundry list that Dr. Shnyra would recite immediately thereafter.

153.    Notably, during his brief meeting with Dr. Shnyra, Mr. Plansky acknowledged that "of course you guys are not going through an audit." This was a stark admission that all of the preparation work and demands of the fictitious "pre-audit" were designed solely to intimidate and drive Dr. Shnyra from the Bank by draining her and her group and diverting critical resources with substantial demands of non-relevant work outside of business hours.

154.    Mr. Plansky left ERAS's offices immediately after making his announcement. Notably, in the discussions with another male executive from ERAS, Mr. Plansky was entirely amicable and encouraging, as Dr. Shnyra later learned from others within her group.

155.    The news of ERAS supposed "strategic irrelevance" came as a complete shock to Dr. Shnyra and the entire ERAS team; this was wholly at odds with the ERAS' crucial position

within State Street. Indeed, prior to October 3rd, State Street's long-term plans included a dramatic expansion of ERAS' staff, not its complete dissolution. Equally important, both Mr. Plansky and Mr. Lowry had previously stated that their strategic vision for the Bank included State Street competing with the likes of Bloomberg, PIMCO, and BlackRock—each of which had a unit that provided analytical services substantively identical to ERAS's role within the Bank.

156. In fact, State Street's decision to disband ERAS was neither "strategic" nor driven by any other business rationale. This became readily apparent as State Street had invested no effort and forethought into ensuring an orderly wind down and transition of ERAS' business in the remaining 57 days.

157. The service contracts and deliverables for ERAS extended well beyond December 1, 2017, with the scope of work going as far as September 2018. Yet, none of the ERAS' clients had been notified of this drastic decision, as Dr. Shnyra quickly learned when she started calling these clients immediately after the announcement. Moreover, as Mr. Lowry effectively acknowledged in his emails, State Street did not consider ERAS' contractual relationships or the revenue put at risk by this drastic decision.

158. What ensued was not an orderly transition, but a period of frantic activity characterized by chaos and disorganization. Ill-informed clients with competing interests were vying for ever-shrinking resources at ERAS.

159. Notably, Mr. Plansky never participated in the discussions of transition with clients. Mr. Lowry attended a single joint meeting with ERAS and one of its clients, on October 16, 2017. Furthermore, GX did not provide any technical or logistical support for transition.

This left Dr. Shnyra and her colleagues at ERAS to negotiate and navigate all the details of transition on their own.

160.    As of October 3, 2017,  ERAS had three major projects:  a project with State Street Associates ("SSA"); engagement with State Street Global Services ("SSGS" or "GS"), and another project with State Street Global Markets ("SSGM" or "GM").   In transition, all three projects experienced a significant degree of discord, inefficiencies, infighting, and turbulence.

161.    In a clear example of the continued strategic importance of ERAS's work, the Bank almost immediately contracted an external consulting firm, Deloitte, to continue with the ERAS' project for SSGM.  Moreover, as SSGM continued to proceed with contracting vendors for another important project, the FRTB Quantitative Impact study, a new advisory partner had to be selected to perform required analysis together with SAS (external vendor) and SSGM.

162.    Not surprisingly, SSGM would eventually ask Deloitte to hire SSGX personnel to continue with the same projects ERAS was engaged on, but this time through Deloitte.

163.    Other events at SSGM would serve as an excellent illustration of the wholesale mismanagement and gamesmanship that fell on Dr. Shnyra and her colleagues at ERAS during this ill-conceived and bogus "wind-down."

164.    In her conversations with a senior official at GM, Daniel Bouchard, Dr. Shnyra learned that GM was laboring under substantial misconceptions, misinformation and rumors circulated, among others, by a GM employee and Assistant VP, Waseem Arshad.

165.    Mr. Arshad incorrectly asserted that ERAS was going to abandon its contracts, in bad faith.  That was simply not true, and Dr. Shnyra assured Mr. Bouchard that ERAS would deliver on its obligations.

166.     In another instance, Mr. Bouchard read off to Dr. Shnyra a list, supplied by Mr. Arshad, of supposedly five "key" ERAS employees working on the GM project and insisted that these employees be immediately transferred to GM.  It took several conversations for Dr. Shnyra to explain that ERAS employees collaborated on project deliveries so that no employee (or a group) would be responsible for one project, and, hence, there could not be any "key" employees in a sense used by GM.

167.     Dr. Shnyra also repeatedly communicated that it is essential that all employees continue to be supervised and have access to the required technology within ERAS to avoid any adverse impact on the contractual deliverables to SSGM as well as SSGS.

168.     Nonetheless, issues with the GM project persisted.  In particular, Mr. Arshad continued with blatant and half-baked efforts to poach ERAS' employees for GM.

169.     At one point, on October 9, 2017, Mr. Arshad called in the afternoon to tell Dr. Shnyra that he was coming down from Boston to New York the next morning for a "meet and greet" with her "team"—even though he had worked with ERAS for over a year and knew its employees well.

170.     Dr. Shnyra quickly discovered that Mr. Arshad had been contacting her subordinates ahead of his visit, without her knowledge, and complained to Mr. Arshad's superior,  Patricia Flynn.  Mr. Arshad, however, refused to cancel his trip under the false pretext that he had already scheduled some meetings with ERAS employees (none were scheduled).

171.     When Mr. Arshad and Ms. Flynn met with. Dr. Shnyra on the morning of October 10th, the discussion turned, again, to GM's desire to move the supposedly "key" ERAS employees into its division.  Notably, Dr. Shnyra was not on GM's list of "key" employees.

172.    Equally of note, some of the supposedly "key" employees that did make it on that list were not only unimportant to GM—many were engaged on a project with a totally different division of State Street, Global Services (GS).

173.    Dr. Shnyra's obvious and constructive response to this escalating turf war was to invite representatives of GM and GS to a joint meeting, to sort out priorities and deliverables. Such meeting was, in fact, scheduled for October 16, 2017.  This was the first available business day for all of the executives and when Dr. Shnyra would be back from a period of religious observance. In particular, Dr. Shnyra was going to be out of the office, with no access to phone or computer, from the evening of October 11th through the evening of October 14th, to celebrate the Jewish New Year and Shabbat.

174.    Incredibly, even though Dr. Shnyra clearly informed Mr. Arshad of her planned absence, he turned around and again attempted to schedule meetings with Dr. Shnyra's subordinates—at the exact time she was out of the office.

175.    This astonishing slap in the face of Dr. Shnyra's religious beliefs, regrettably, was part of a pattern of insensitive and discriminatory misconduct by State Street, as detailed throughout here.

176.    The preceding examples highlight both ERAS' crucial role in State Street's business and the remarkably haphazard manner in which State Street's senior management went about dissolving Dr. Shnyra's unit.

177.    Yet, there were other clear indicators that State Street had given no thought to ERAS's wind-down, to the point that, in the process, it engaged in violations of employment and labor laws as well as its severance policies.  These violations included:

(a)     breaking up ERAS, an established and stable group within State Street's corporate structure, unto multiple bogus and overlapping "decisional units" which had no business rationale and grouped together employees with wildly different job descriptions— in part, to minimize the number of employees over 40 within each false "unit" and avoid paying special benefits to these protected employees in violation of Older Workers Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1)(H)(i)-(ii);[6]

(b)     failing to provide ERAS employees with 90-day notice of their layoff in violation of the federal Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2102(a), as well as New York State WARN Act, Labor Law § 860 *et seq*.

(c)     fraudulently advertising open positions at GM, with a false job description, with the illicit intention of filling these positions with company insiders, in violation of U.S. Department of Labor ("DOL") regulations;

(d)     violating provisions of Immigration and Nationality Act of 1952 ("INA"), and its implementing regulations, by hiring two (2) foreign nationals with H1B visas under the aforementioned false job descriptions, and thus disadvantaging qualified and available American workers who would be fit for this job, had the job description been reflective of the expected responsibilities and required set of skills;

(e)     misrepresenting reduction-in-force ("RIF") criteria for disbanding ERAS, whereby (a) stated rationale by management at the time of announcement was that ERAS was no longer "strategically important" to State Street's business, which stands in conflict with (b) the criteria offered in severance notices under OWBPA were cost-cutting and performance-based; and

(f)     failing to pay several employees of ERAS a bonus, designated as "Special Severance Payment" in the severance package, in knowing a violation of the Bank's own severance policy.

---

[6] ERAS employees were haphazardly separated into such bogus decisional units as "GX IT Rsrch & Advisory," "GPM Strat Prod Initiatives," and "GX R&D Product StrategyL6," among others. Lumping together into these phantom "units" ERAS's employees with completely different job description further obfuscated the evaluation process by which an employer chose certain employees for a program and ruled out others from that program in direct violation of the dicates of the governing law. Not surprisingly, several former employees raised concerns about the fake "decisional units" to which they have been assigned, as well as heretofore-unknown and meaningless names of such "units." In one of the most obvious examples of blatant obfuscation, a decisional "unit" that included an employee, did *not* include that employee's direct supervisor, yet it *did* include a more senior executive just above that supervisor.

178.    In a remarkable turn of events, State Street admitted to some of these violations—in writing.

179.    In a January 16, 2018 letter from a senior HR executive, State Street has conceded that, in its rush to disband Dr. Shnyra's entire group, the Bank manufactured fictitious "decisional units," which had no business purpose, and furthermore State Street "did not accurately describe rationale" for its momentous decision to dissolve ERAS.

180.    On information and belief, these were not inadvertent or innocent errors, but deliberate misrepresentations.  State Street's decisions and disclosures touched on the most critical aspects of the Bank's employment policies and impacted a wide range of governance and documentation protocols across multiple State Street functions, including HR, audit, risk, compliance, payroll and some others.

181.    Given regulatory requirements for appropriate sign-offs on the RIF protocols by multiple stakeholders and senior management across the organization, this could not possibly be a mere failure of controls and oversight. Instead, on information and belief, the bogus "decision units" and fake "rationale" were designed solely to saw confusion and sidestep State Street's obligations to another protected class of employees, in violation of the aforementioned OWBPA and minimize any potential payments due to these employees under RIF summary plan.

182.    Moreover (and separate from the Bank's violations of OWBPA), since State Street had chosen to make similar disclosures on "decisional units" to a wide range of impacted employees, both within and outside of ERAS, the Bank had an obligation to provide all of these employees with accurate information. In this, State Street has failed, completely and spectacularly.

183.     Instead, in response to inquiries and complaints raised by several male members of Dr. Shnyra's group, State Street abandoned its bogus and numerous "units" in favor of one unit—the entire Enterprise Risk Advisory Services ("ERAS") group—as well as withdrew previously fabricated rationale for termination that referenced a "number of factors including performance and others."

184.     Limiting the decisional unit to ERAS, however, was equally nonsensical. In other words, to say that the entire ERAS group was "selected" for termination provided no basis for comparison and did not identify the selection mechanism by which employees and group overall were designated for termination. It also did not address the layoffs of employees outside of ERAS, which occurred on the same date and at the same site location.

185.     Of course, that is exactly what State Street was trying to hide—that there was not "strategic" or other business reason for the sudden dissolution of a viable and profitable group like ERAS. The real reason was State Street's desire to cover up its wrongful termination of Dr. Shnyra and systematic gender discrimination and workplace harassment that preceded her termination.

186.     Equally of note, as discussed earlier, even as State Street admitted its "errors" and sought to correct them—it did so only with respect to the _male_ employees of ERAS but not to the group's _female_ employees.   Indeed, on information and belief, State Street never made full disclosures and did not provide accurate information to any of the other impacted employees.

187.     Moreover, Dr. Shnyra's wrongful termination and the events surrounding it were not the first instances where State Street mistreated and discriminated against its employees and cavalierly disregarded the law in the process.   Twice before, in 2016, the HR department's representatives had overreached and grossly misinterpreted the applicable law in dealing with

unfounded complaints against Dr. Shnyra—to the point that both representatives lost their jobs due to these incidents once Dr. Shnyra has challenged the proceedings of their operations.

188.   Nor was this the first time State Street had discriminated against its female employees.

189.   On October 5, 2017, two days after wrongfully terminating Dr. Shnyra in an elaborate scheme described above, there was a news break that State Street has agreed to pay $5 million in back pay and interest to a group of 305 female employees to settle claims that the Bank had been substantially underpaying its female employees as against their male counterparts.

190.   Dr. Shnyra has now joined the hundreds of female employees at State Street who have suffered as the result of gender discrimination.  She persistently complained and fought against disparate treatment at the hands of her supervisors, and was pushed out of State Street in an elaborate scheme designed to cover the Bank's tracks.

### FACTUAL BACKGROUND FOR ALEXANDER REYNGOLD

#### Summary

191.   Despite Mr. Reyngold's outstanding track record of success as a business leader and manager, State Street repeatedly passed him over for promotions in favor of younger employees, who were, objectively, far less qualified and accomplished, as well as less financially successful in developing business pipeline than Mr. Reyngold.  This mistreatment occurred even though during his employment with State Street, Mr. Reyngold had regularly received "higher than average" performance ratings and significantly contributed to the company's bottom line.

192.    During Mr. Reyngold's entire tenure at State Street, the Bank frequently put up unreasonable roadblocks to his professional development and development of the business line overall, which was tied to his personal performance, by completely denying ERAS and him, as its leader, access to critical resources, including both financial and human capital resources. There were obvious signs of disparate and discriminatory treatment by ERAS leadership, the Bank repeatedly blocked any requests in support of sales activities originated by Mr. Reyngold's team and declined to provide even minimal assistance in such basic tasks as a collection of information required for client development and retention.   In stark contrast to ERAS, other groups within State Street (including SSA, TruView, and Quantextual) received substantial support from sales and relationship management departments and were provided with the required information and resources to facilitate their business activities and achieve their revenue targets.

193.    The Bank also repeatedly failed in addressing Mr. Reyngold's requests to use relationship management resources to arrange required business meetings and introductions of business.   In one of the most outrageous examples, State Street management ignored and failed to fulfill Mr. Reyngold's request for a meeting with General Electrics *for over three years*, while other groups within the Bank requested and held meetings with the same company *several times over the same period*.

194.    The Bank further denied Mr. Reyngold's repeated requests to create a designated website for ERAS, to market its capabilities to a broader audience, making it significantly much more difficult for his group and, by extension, Mr. Reyngold to attain revenue targets.   Again, in notable contrast with ERAS, all other similarly situated groups, including SSA and TruView, had designated websites to support their business development efforts.   Of course, availability of the

appropriate marketing tools, such as a stand-alone website, was key to reaching and disseminating information to the potential clients outside of State Street.

195.    In short, ERAS grew and became successful despite severe disadvantages and roadblocks erected by State Street's management—and solely because of my tenacity, professionalism, and acumen as the group's business leader.

196.    Remarkably, when Mr. Reyngold took actions in explicit support of Dr. Shnyra's fight against egregious gender discrimination, State Street terminated Mr. Reyngold' and Dr. Shnyra's employment at the Bank in retaliation for their protected actions.

197.    As detailed throughout here, Mr. Reyngold fell victim to State Street's massive "witch hunt" against him and his closest associate at the Bank, Dr. Shnyra.  Mr. Reyngold could not stand idly by and witness the terrible abuse State Street's most senior managers were heaping on Dr. Shnyra, in violation of myriad internal and external rules and regulations.  He openly supported, at every step, Dr. Shnyra's fight against such egregious mistreatment.  In retaliation for Dr. Shnyra's and Mr. Reyngold's lawful exercise of their fundamental rights, State Street got rid of them—via a massive scheme designed to cover up the Company's egregious misconduct and retaliation toward Mr. Reyngold and Dr. Shnyra.

198.    As further detailed throughout, State Street's illicit actions against Mr. Reyngold (and, in equal measure, against Dr. Shnyra) were part of a pattern of the Bank's mistreatment not only of its female employees but anyone who is not part of State Street's male-dominated culture, the proverbial "old boys network," or "Boston club" as it was informally called within the company.  Not surprisingly, it was employees in most vulnerable groups (women, minorities, older employees) who had an especially difficult time surviving—let alone, thriving—in the hostile work environment of State Street's "Boston club."

**State Street Repeatedly Discriminates Against Mr. Reyngold
in Promotions and Other Career Growth Opportunities**

199.    Mr. Reyngold was employed with State Street from November 25, 2013, until December 1, 2017, in the position of Managing Director and Head of ERAS.  At the time of his wrongful termination (and similar to Dr. Shnyra), Mr. Reyngold was a stellar performer and a highly compensated employee of State Street Global Exchange ("SSGX" or "GX"), earning in excess of $ 550,000 per year in 2016 in salary and performance-based compensation.

200.    Mr. Reyngold and Dr. Shnyra jointly built, from the ground up, an entirely new unit within SSGX, the aforementioned ERAS.

201.    Mr. Reyngold was the overall Head of ERAS, and Dr. Shnyra was ERAS's Head of Execution.  While Dr. Shnyra reported directly to Mr. Reyngold, in reality, they held a joint leadership of the group, as recognized by multiple executives across the Bank.   Under Mr. Reyngold's and Dr. Shnyra's leadership, ERAS emerged as a powerhouse within State Street, growing from a 2-person shop into a high-performing group of 17 employees, annual revenues in excess of $6 million and highest profit margin among similarly situated units within SSGX.

202.    In spite of ERAS's obvious successes, Mr. Reyngold (similarly to Dr. Shnyra) was denied the types of career-building and advancement opportunities commensurate with his performance. Twice, in 2015 and 2016, Mr. Reyngold was passed over for promotion from Managing Director to Senior Vice President ("SVP") in favor of younger candidates who were far less experienced and failed to meet their revenue targets as well as having fewer direct reports.  Notably, at all times relevant herein, Mr. Reyngold was over 40 years old; had always received "above average" performance evaluations, and was frequently praised by senior executives on his success in developing business.

203.    In 2016, for instance, State Street promoted to SVP—ahead and over Mr. Reyngold—David Turkington, a 32-year-old with limited professional experience and no advanced degree.  Mr. Turkington also regularly failed to meet revenue targets assigned to him, individually, and to Mr. Turkington 's group, SSA, and had a minimal number of direct reports as well as limited managerial experience, as compared to Mr. Reyngold.

204.    Furthermore, ERAS's travel budget was minuscule, as compared with substantial budgets of other equally situated groups within SSGX such as the aforementioned SSA and NextGen Risk.  State Street never showcased or promoted Mr. Reyngold's group as part of its in-house conferences, or during any of the external events sponsored and attended by the Bank. Nor did State Street ever provide any additional budget to overcome these artificially imposed arbitrary constraints for Mr. Reyngold's entire time with the Bank.  Such opportunities and resources were readily available to above-referenced groups.

205.    ERAS's budget constraints meant that Mr. Reyngold (or Dr. Shnyra) could not travel to numerous professional, networking and career-building events that were readily available to their colleagues in other groups.  It also meant that Mr. Reyngold and Dr. Shnyra had to engage the clients and meet their revenue targets, without having any legitimate means to showcase ERAS' services and capabilities externally or garnering support from broader sales and relationship management organizations of State Street.

206.    Moreover, when State Street itself scheduled off-site networking and/or team-building events, on more than one occasion, these were scheduled during the times Mr. Reyngold and Dr. Shnyra were observing religious holidays and could not possibly attend. When Mr. Reyngold or Dr. Shnyra indicated that certain events were scheduled during Jewish religious holidays, members of senior management exhibited incredible insensitivity to their faith.  These

superiors often became argumentative, indicating that "they know of Jewish religious laws from their husband, and it is acceptable for Jews to work on all of the days of Passover week, we just cannot put leavened food in front of you" while, in fact, Jewish tradition and strictures, prohibit working on four out of the eight days of the Passover observance.

207.   Mr. Reyngold was frequently pressured to decide "who this year will observe the holidays," i.e., he or Dr. Shnyra, to send someone to represent the team at an offsite event, again scheduled at the time of a Jewish holiday.   Mr. Reyngold was never offered an alternative arrangement when offsite events or important internal company-wide leadership meetings fell on Jewish religious holidays. When he and Dr. Shnyra took the initiative to provide a schedule of religious holidays to the senior management, senior management did not express any interest and no such schedule has ever been put in place.

208.   When Mr. Reyngold requested kosher food for an event he was told that "it is too late for such request, I have already ordered everything."   It was obvious, however, that an addition of one or two kosher meals would neither materially contribute to the cost nor somehow require advance notice—at that time, there was at least one, if not more, a kosher place very close to State Street's headquarters in Boston that delivered food on demand.   Clearly, in addition to other barriers, Mr. Reyngold's faith made it harder for him to function and succeed within State Street's closed-minded "Boston club."

209.   Notably, throughout his tenure at State Street, from the beginning of 2014 through October 2017, Mr. Reyngold, continued to receive highest performance rankings yet was never given any clear and constructive feedback on the status of his promotion and specifics of what prevented Mr. Reyngold's promotion or even nomination for the SVP position.

210.    In short, Mr. Reyngold—an employee in his 40s and first-generation immigrant (a Jewish refugee from the Former Soviet Union) who had chosen to follow Jewish Orthodox religious laws —was denied opportunities that were readily available to those employees considered to be part of the so-called "Boston club." [7]

211.    In a remarkable admission, Mr. Reyngold's then direct supervisor, Dr. Jessica Donohue, at one point even indicated that it would be very difficult for him to get promoted due to, among other things, his supposed "accent."   Mr. Reyngold found this revelation truly shocking and distressing, under the circumstances and given the fact that for some twenty years, he has been a participant, presenter, and speaker at numerous industry conferences and a successful professional in the demanding field of financial analytics.

212.    Mr. Reyngold was equally surprised to find out that, on information and belief, Louis Maiuri, the overall Head of SSGX at the time, "did not believe that" employees in Mr. Reyngold's position (i.e., "quants") "would make good Senior Vice Presidents."

213.    State Street, of course, had no sperate promotion policy and requirements for quantitative professionals, as compared to everyone else, not to mention the fact that Mr. Reynogld was hardly a simple "quant"; he was in a somewhat unique position of being responsible for ERAS's P&L, and as such had to assume multiple responsibilities within his group.   In fact, two SVPs in their 30s – William Kinlaw and David Turkington –considered themselves to be researchers and quantitative professionals. This designation did not prevent their career advancement, given that they were part of State Street's "Boston club."

---

[7] Tellingly, Mr. Reyngold's direct supervisor, the aforementioned Dr. Donohue, at one point, even suggested that I should consider moving to Boston to help my career development.

214. State Street continued to mistreat Mr. Reyngold and block his career advancement in 2017.

215. Mr. Reyngold had been discussing his desire for career development and growth with his superiors, including the aforementioned Dr. Donohue, since the first year of his employment at State Street. When Dr. Donohue accepted a promotion and moved up the corporate ladder in early 2017, she assured Mr. Reyngold that she had held discussions with Mr. Reyngold's incoming supervisor, James R. Lowry, regarding the status of his career advancement and Mr. Reyngold's nomination for SVP during the 2017 cycle. Yet, Mr. Reyngold had to chase Mr. Lowry for months to learn that he was *not* nominated for an SVP position in 2017. Mr. Lowry declined to provide any further details as to what prevented Mr. Reyngold from being considered for this promotion.

216. Notably, during the entire year 2017, Mr. Reyngold never received *any* performance evaluation—even though (1) his outgoing manager, Dr. Donohue, had assured him explicitly that she had discussed his nomination and promotion for that year with the incoming manager, J.R. Lowry; (2) the Bank's internal policies required two such evaluations per calendar year; and (3) Mr. Reyngold's promotion would have been based on the aforementioned evaluations. Plainly, State Street's senior management reneged on its repeated promises of promotion and because by any objective criteria Mr. Reyngold's performance was stellar, simply avoided evaluating him altogether.

217. Not surprisingly, Mr. Reyngold was extremely disappointed by these delays and utter lack of transparency and reached out to his other supervisors, Mr. John Plansky and Mr. Maiuri. However, Mr. Reyngold continued to face roadblocks and obfuscations across the management structure.

218.    Mr. Plansky at first indicated that the reason why Mr. Reyngold was not considered for promotion to SVP was that Mr. Lowry did not put Mr. Reyngold on the list of nominees for consideration (implying that there were other candidates that were included in such list).

219.    For his part, Mr. Lowry said that he was not aware of any such "lists" or any other ways in which he or Mr. Plansky were to handle promotions. Mr. Lowry's feedback completely contradicted what Mr. Plansky had told Mr. Reyngold, even though Mr. Plansky and Mr. Lowry had weekly one-on-one meetings, in addition to the weekly reports, and had plenty of opportunities for clarification.

220.    Indeed, during all of the foregoing discussions, Mr. Lowry proved himself less than cooperative, denying any managerial responsibility to follow up with Mr. Plansky regarding the promotion cycle and the status of Mr. Reyngold's promotion.  Despite Mr. Lowry being Mr. Reyngold's direct supervisor, and in contradiction of multiple internal policies at State Street, Mr. Lowry neither (a) provided Mr. Reyngold with any performance evaluation in the eleven 11 months Mr. Lowry was Mr. Reyngold's manager; nor (b) shared any details on the promotion process, keeping from Mr. Reyngold the exact timelines and steps required to go through the nomination and promotion process.  On information and belief, Mr. Lowry was not invested in providing Mr. Reyngold with equal opportunities for the latter's career development.

221.    Moreover, Mr. Lowry could not possibly plead ignorance of the promotion process for SVPs.  Being an SVP himself, Mr. Lowry not only was familiar with that process, but almost by definition, knew the process exceptionally well, given the fact that he had multiple MDs in his managerial purview, and would be required to assess any promotion request coming from these MDs.

222.     Mr. Lowry's silence and obfuscation made it impossible for Mr. Reyngold to develop a business case in support of his candidacy and obtain recommendations for his promotion.  Notably, as Mr. Reyngold would learn later from one of his colleagues at ERAS, Kenneth Walker, Mr. Lowry had been looking for any "dirt" on Mr. Reyngold since February 2017.  In short, Mr. Lowry did everything in his power to stall and thwart Mr. Reyngold's career advancement.

223.     Equally of note, the aforementioned Global Head of SSGX and SSGM, Mr. Maiuri, repeatedly expressed to Mr. Reyngold genuine surprise that, in all the time relevant herein, no one at State Street had ever given Mr. Reyngold any reason for failure to promote him. Mr. Maiuri, in turn, stated that Mr. Plansky would be required to do at least explain why Mr. Reyngold was not being promoted and encouraged Mr. Reyngold to follow up with Mr. Plansky.

224.     Over a period of time from April to September 2017, Mr. Reyngold reached out several times to Mr. Plansky, both in person and in writing, requesting as to what had happened in the communication between Mr. Lowry and Mr. Plansky and specifically why Mr. Reyngold's performance did not qualify him for promotion.  Mr. Reyngold provided a detailed analysis in support of his promotion and expressed serious concerns with utter lack of transparency and numerous inconsistencies in the nomination/promotion process.  Nonetheless, Mr. Plansky continued to ignore and deflect Mr. Reyngold's requests and provided no explanation as to why Mr. Reyngold did not qualify for a promotion.

225.     In another chilling admission, Mr. Plansky eventually told Mr. Reyngold that "I have decided already who will be promoted from SSGX in 2017, it will be only one person and it will not be you," i.e., not Mr. Reyngold.  Like Dr. Donohue's earlier comments, Mr. Plansky's statement was clear proof of lack of due process and decisions being made by executive "fiat," in

violation of numerous internal policies and procedures put in place at State Street to prevent precisely this type of misconduct.

226.    In retrospect, of course, State Street's repeated mistreatment of Mr. Reyngold was nothing but a continuation of a pattern of violation of numerous labor and employment laws that State Street has been engaged in for years.

### State Street Fires Mr. Reyngold In Retaliation For His Support of Dr. Shnyra's Gender Discrimination Claims

227.    Mr. Reyngold first learned about Dr. Shnyra's mistreatment and harassment in early 2015 when Dr. Shnyra approached him, as her immediate supervisor, to let Mr. Reyngold know that continuous pattern of mistreatment from the HR specialist assigned to our group, Dana Hopkinson, was detracting from her day-to-day activities.

228.    Notably for the purposes here, throughout his tenure at State Street, Mr. Reyngold had zero tolerance for bullying and mistreatment of any of his colleagues and subordinates.

229.    Mr. Reyngold always advocated for the diversity of talent in his team, and he promoted meritocracy and recognition across the entire ERAS group.  Mr. Reyngold's team had a higher-than-average percentage of female talent, for State Street overall; often requested off-the cycle promotions to recognize the potential of qualified talent, regardless of their age or gender; and ensured that all employees in protected classes were treated fairly.

230.    By way of one example of many, Mr. Reyngold successfully advocated for paying an older African-American employee, Itunimi Savage, a base salary of $210,000 with a sign on bonus of $35,000 when Mr. Savage was hired as a Vice President at ERAS.  Mr. Reyngold persisted despite HR and senior management's recommendations for a significantly lower compensation and no sign-on bonus.

231.    It was Mr. Reyngold and Dr. Shnyra who yet again insisted on fair compensation for another ERAS hire, Kenneth Walker, despite significant pressure from the management and HR for significantly lower compensation. Mr. Walker, at the time of his hiring for the Managing Director position at ERAS, was 62 years old.

232.    Mr. Reyngold and Dr. Shnyra not only faced headwinds from senior management, in their efforts to ensure that Mr. Walker was fairly compensated; they also had to fight mistreatment of Mr. Walker by the same HR specialist, Mr. Hopkinson, who had been discriminating against Dr. Shnyra.

233.    Mr. Hopkinson, yet again, put up unnecessary roadblocks and caused significant delays in the hiring of Mr. Walker, an older employee, by advocating for arbitrary non-compliant changes in the hiring process, all of which Mr. Reyngold and Dr. Shnyra had to circumvent. Mr. Hopkinson delayed the hiring of Mr. Walker by more than two months, as compared with initially scheduled start date for Mr. Walker.

234.    Despite frequently facing great resistance from senior management, Mr. Reyngold felt strongly that it was crucial to commit to basic principles of equality, even when they went against entrenched customs of State Street's "Boston club."  Mr. Reyngold could not stand idly by when someone would pick on the employees who were different, thought different, or simply because the abuser had the power to do that.

235.    Mr. Reyngold agreed with Dr. Shnyra's approach to trying to resolve her issues amicably, internally and more informally with Mr. Hopkinson.  Mr. Reyngold even facilitated an in-person meeting between the two in December of 2015, unfortunately without any improvements to Mr. Hopkinson's terrible attitude and behavior.

236. Mr. Reyngold was also aware and supported Dr. Shnyra's decision to bring an official complaint of gender discrimination against Mr. Hopkinson after all her informal efforts failed.

237. Naturally, Mr. Reyngold was concerned with the wellbeing and career of his closest colleague and senior employee at ERAS; thus, he repeatedly followed up with the HR department on the progress of Dr. Shnyra's complaint and investigation. State Street failed to respond to Mr. Reyngold inquiries, just as it did not respond to Dr. Shnyra. In fact, Mr. Reyngold was not even interviewed as a part of State Street's supposed "investigation" of Dr. Shnyra's complaints against Mr. Hopkinson. Notably, State Street never shared with Mr. Reyngold or Dr. Shnyra any results from this so-called "investigation"—until after they had both had been terminated.

238. Mr. Reyngold witnessed and advocated against State Street's disparate treatment of Dr. Shnyra, in other matters. He repeatedly brought up the issue of Dr. Shnyra's lower pay to his then direct supervisor, Dr. Donohue, who responded with "we will consider raising Dr. Shnyra's salary in a couple of years."

239. The timing of Mr. Reyngold's conversation with Dr. Donohue was equally notable. It occurred in April of 2016, just before the 2016 nomination cycle for SVPs were to begin. On information and belief, the two events were related: after raising concerns about disparate treatment of a female colleague, Mr. Reyngold was passed up for promotion, yet again, with no reasons being given as to why.

240. Dr. Donohue merely offered vague and generalized excuses for stalling Mr. Reyngold, such as "now it's already too late, but we will definitely proceed with the nomination [for promotion] next year." There was no explanation, for example, why Mr. Reyngold's

manager deliberately elected to "miss" the deadline for submitting Mr. Reyngold's nomination for promotion or any reasons as to what prevented Dr. Donohue from doing so.

241.    Equally crucial for the purposes here, Mr. Reyngold witnessed, first-hand, many of the escalating attacks on Dr. Shnyra by John Plansky in August and September of 2017.  As Dr. Shnyra's direct supervisor, Mr. Reyngold was present during the calls and in-person meetings at which Mr. Plansky harassed, demeaned and threatened Dr. Shnyra.  Mr. Reyngold was also included on all of the emails between Dr. Shnyra and other managers, during this period.

242.    Mr. Reyngold was extremely concerned with the entire situation and was ready and willing to help Dr. Shnyra.  Indeed, when events escalated well beyond Dr. Shnyra's control, Mr. Reyngold reached out to another more senior supervisor, the aforementioned Louis Maiuri, via email.  Notably, Mr. Maiuri also did not respond to Dr. Shnyra's email in which she detailed her harassment and concerns to executive management of State Street, vividly describing a hostile situation that was escalating and evolving.

243.    Mr. Reyngold was interviewed by HR specialist, Erin Toomey, regarding the interactions he witnessed between Dr. Shnyra and Mr. Plansky.  During the interview, Mr. Reyngold expressed his most profound concerns as to the style and content of these interactions, indicating that, in his view and the view of any reasonable person, Mr. Plansky's treatment of Dr. Shnyra was discriminatory and derogatory.

244.    During the interview, Mr. Reyngold also repeatedly asked Ms. Toomey if the company's investigation revealed whether Mr. Plansky was representing the official position of State Street as an organization or whether Mr. Plansky was arbitrarily expressing his own personal opinions in such inappropriate fashion. Ms. Toomey did not respond to these questions,

beyond indicating that State Street would review Mr. Reyngold's concerns.  However, neither she nor anyone else at State Street followed up with Mr. Reyngold—again until the very end of his employment at State Street.

245.   It was truly astounding that, as Mr. Reyngold would later learn, Ms. Toomey turned around and told Dr. Shnyra that no witnesses expressed any concerns with Mr. Plansky's persistent and escalating abuse of Dr. Shnyra and an internal investigation found nothing inappropriate or discriminatory in Mr. Plansky behavior.  In hindsight, it is hardly surprising that neither Ms. Toomey nor anyone else at State Street followed up with Mr. Reyngold, given that the Bank was looking to hush up this misconduct.

246.   Shortly after Dr. Shnyra's and Mr. Reyngold's wholly legitimate complaints, on October 3, 2017, State Street decided to terminate their employment, and cover up its despicable conduct by disbanding the entire ERAS unit they had built from scratch.  There is no doubt that, in connection with Mr. Reyngold's in particular, this was done in clear retaliation for Mr. Reyngold's efforts to help Dr. Shnyra vindicate her constitutional rights and fight against gender discrimination.

247.   In this regard, the Bank's "official" reasons for disbanding a well-performing, successful group like ERAS were wholly made-up and riddled with contradictions.  Indeed, in the course of its massive cover-up, State Street repeatedly changed its stated "rationale" for the reduction in force ("RIF") initiative under which it terminated Mr. Shnyra and Mr. Reyngold.

248.   The ostensible reason, communicated verbally to all employees by Mr. Plansky at the time of dissolution, was that ERAS group was no longer "strategically relevant."  On the other hand, ERAS's older employees received a written notification in which State Street said that the wholesale dismantling of ERAS supposedly was based on "a broad range of variably

weighted criteria[,] . . . includ[ing] each's professional background, employment history, and job performance, as well as his or her technical, managerial, and leadership skills, work productivity, demonstrated commitment to teamwork and overall attitude, client relationship, educational and professional achievement, and time in the job."

249.   However, when Mr. Reyngold together with Mr. Walker (a similarly situated older colleague), challenged the reasons for the dismantling of the entire group, State Street admitted, among other things, that it "did not accurately describe rationale" for this momentous decision.

250.   Given the sheer size and complexity of State Street's bureaucracy, it is impossible to fathom that for over six (6) months no one in the chain of command and those charged with approving the dismantlement of Mr. Reyngold's entire group, noticed a so-called "mistake" in the stated rationale—the most crucial attribute in the RIF event—despite repeated inquiries by Mr. Reyngold and other affected colleagues in the wake of their termination.

251.   When Mr. Reyngold finally received his personnel file from State Street, after repeated demands, it was sanitized of any information that related to his so-called "review" for promotion as if Mr. Reyngold had never even discussed that question with his managers.

252.   However, a closer look at the little information State Street *did* disclose to Mr. Reyngold further highlighted the incredible rush, inconsistencies as well as lack of any business judgment and reason in the Bank's decision to terminate Mr. Reyngold and Dr. Shnyra and disband their entire group.

253.   On information and belief, State Street had culled and doctored Mr. Reyngold's personnel file, without any consideration for the accuracy of the information contained there or

the Bank's legal duty to notify an employee when material changes, such as department transfer take place, in violation of labor laws.

254.    Remarkably, Mr. Reyngold's personnel file records four department transfers of—none of which Mr. Reyngold was aware.  In several instances, department names make no sense or are missing altogether.[8]

255.    In another instant of total bungling, Mr. Reyngold's file lists his employment status as going through "Reclassification" on November 19, 2017—or more than a month after Mr. Reyngold was slated for wrongful termination.

256.    Most notably, the personnel file provides yet another—third—reason, for Mr. Reyngold's termination.  And that reason offers the clearest proof of State Street's utter lack of business reason for dismantling ERAS.

257.    On December 2, 2017, and May 5, 2018, Mr. Reyngold's file list his employment status as "Term[innated] w/Pay," and "Termination," respectively, with the reason stated in both instances, as "[]Beacon." Beacon, or "B.E.A.C.O.N." as it was known at State Street, stood for "Best-in-class service and solutions," a new program and set of standards the Bank rolled out in 2015.  In its official press release at the time, State Street touted BEACON as the program that would lead to improved service and results, such as "End-to-end service delivery," "Agile methodologies," "Client-centric design and execution," "One view of the client Next generation technology platform."

---

[8] Among the inconsistencies, Mr. Reyngold's personnel file lists such non-existent, non-sensical department such as "Bus Dev an," "Blank," "1212006", and "ENTERPRISE" (all caps). None of these departments have anything to do with Enterprise Risk Advisory Services, the one unit where Mr. Reyngold was employed.

258.    Terminating Mr. Reyngold and his group for supposed failure to comply with the "BEACON" standards was the height of duplicity and disingenuousness.  ERAS was *the* unit within State Street that exemplified successful implementation of the "BEACON" standards, in providing service excellence internally and externally on behalf of State Street.  ERAS scoped and operated the largest Hadoop cluster[9]] in the organization and offered scalability and flexibility on the execution of multiple, data-intense projects across the organization. ERAS had been delivering "best-in-class" analytics as per Federal Reserve's feedback solutions including the aforementioned OD model. ERAS developed and implemented data services offering and was actively involved in scoping and enabling integration of all data and analytical platforms for State Street Global Markets and new technology solution for State Street Global Services.  All of this information has been in possession by different levels of senior management including John Plansky, Head of SSGX, Louis Maiuri, Head of SSGM and other senior executives for a long time to ensure their familiarity with the core services ERAS provided.  Citing "BEACON" initiative as a reason for termination belies the very core of ERAS's  critical role within the Bank and cannot possibly be considered a legitimate "reason" for the group's wholesale dissolution.

259.    In short, State Street repeatedly denied Mr. Reyngold promotions and opportunities for career advancement — based solely on his age and unwillingness to play by the rules of the Bank's "Boston club" culture.

260.    Then Mr. Reyngold really "crossed the line" in the minds of the "Boston club" elite by "daring" to stand up and support a similarly situated "black sheep" colleague at the

---

[9] A "Hadoop cluster" is a special type of computational cluster designed specifically for storing and analyzing enormous amounts of unstructured data.

Company — Dr. Ksenia Shnyra, a female manager and first-generation immigrant (like Mr. Reyngold) who raised claims of gender discrimination. In retaliation, State Street got rid of Dr. Shnyra and Mr. Reyngold in one fell swoop—by disbanding their entire group to cover up its despicable misconduct.

261.    Yet, just as it was disbanding ERAS, State Street was reaching out to the group's employees in an attempt to offer them employment that would correspond exactly to their responsibilities at ERAS. In doing so, State Street effectively admitted that the Bank's sudden and unexpected decision to disband ERAS was not driven by any "strategic" or "business" considerations—but by the egregious misconduct of State Street senior executives attempting to get rid of Dr.Shnyra and Mr. Reyngold, without any legitimate reason for these unlawful actions.

262.    Mr. Reyngold's wrongful termination by State Street has had significant negative ramification for his career prospects and personal life.

263.    State Street has branded Mr. Reyngold as not acceptable into "Boston club"; difficult to deal with and denied Mr. Reyngold any opportunities for continuing his employment internally, despite multiple positions with similar expertise and SVP and MD level title being posted after his termination. State Street underpaid Mr. Reyngold for the duration of his tenure; denied Mr. Reyngold promotion opportunities with no good reason; and created artificial barriers for Mr. Reyngold, making it exceedingly difficult for him, as compared to other managers, to reach revenue targets for ERAS.

264.    After more than four years at State Street, marked by big successes and hard work, Mr. Reyngold is, suddenly, a pariah. He is unable to obtain a positive recommendation letter from SSGX senior management. On information and belief, colleagues with whom Mr. Reyngold maintained professional relationships are afraid to provide him with "on-the-record"

recommendations, knowing well that executive fiat will not tolerate support to anyone outside of the "Boston club," especially as these colleagues believe that the senior management was "out to get [Mr. Reyngold] from the beginning."

## FACTUAL BACKGROUND FOR KENNETH WALKER

### Summary

265.    Another senior manager at ERAS, Kenneth Walker, also became victim to State Street's invidious discrimination against him on the basis of Mr. Walker's age.  The Bank's wrongful and unlawful mistreatment of Mr. Walker fell squarely within the pattern of such discriminatory conduct against older employees, as has already been described in connection with Mr. Reyngold.

266.    State Street substantially delayed Mr. Walker's hiring, for no other reason (certainly, no good reason) than his age.   After Mr. Walker joined the ERAS team, the Bank made it exceedingly difficult for Mr. Walker to fulfill his duties by creating roadblocks to his work, failing to provide Mr. Walker with critical tools for success, and severely underfunding Mr. Walker's endeavors.  Moreover, and notably for the purposes herein, State Street's persistent efforts to gather compromising information on Mr. Reyngold and Dr. Shnyra, were a clear indication that the Bank was looking for a pretext to get rid of the two senior managers at ERAS.

267.    Furthermore, in its rush to disband ERAS, as part of the aforementioned scheme to get rid of Mr. Reyngold and Dr. Shnyra, State Street discriminated against Mr. Walker by depriving him of the severance payment to which he was plainly entitled under the Bank's own policies.   State Street's contradictory and facially absurd justifications for the sudden and wholesale disbandment of ERAS (similar to the non-sense justifications offered to Mr. Reyngold

and others) were further proof that such dissolution was not "strategic" and served no business purpose.

## State Street Effectively Undermines the Very Work for Which Mr. Walker was Hired

268.   Mr. Walker was 62-year-old at the time he was hired by State Street, in February of 2017, for a position of Managing Director at ERAS.  As part of his role, Mr. Walker was expressly tasked with business development and external sales as a part of his role.  During his tenure at State Street, Mr. Walker was, by far, the oldest employee in his group.

269.   During his relatively short time at State Street, the Bank frequently put up unreasonable barriers to the development of the business line overall, which was tied to his personal performance and performance of ERAS leadership, by completely denying the group and Mr. Walker access to critical resources, including both financial and human capital resources.

270.   State Street repeatedly blocked any requests in support of sales activities originated from Mr. Walker's team and declined to provide even minimal assistance in such basic tasks as a collection of information required for the onboarding as a vendor with multiple external clients.  In stark contrast to ERAS, other groups within State Street (including SSA, TruView, and Quantextual) received substantial support from sales and relationship management departments and were provided with the required information and resources to facilitate their business activities and achieve their revenue targets.

271.   The Bank did not provide any access to facilitate the use of broader State Street relationship management resources to arrange required business meetings and introductions of business.

272.    As Mr. Walker learned from ERAS senior management, State Street chose not to create a designated website for ERAS, to market its capabilities to a broader audience, making it significantly much more difficult for his group to attain revenue targets.  Again, in remarkable contrast with ERAS, all other similarly situated groups, including the aforementioned SSA and TruView, had designated websites to support their business development efforts.  Of course, availability of the appropriate marketing tools, such as a stand-alone website, was key to reaching and disseminating information to the potential clients outside of State Street.

273.    In short, ERAS and Mr. Walker, in his capacity as leader of business development and sales, had to be successful and attain revenue targets despite the disparate treatment and roadblocks erected by State Street's management-and solely because of professionalism and quality of work ERAS delivered. During his short tenure at State Street, ERAS handled three largest clients and about 40 of different workstreams with a staff of 17 people.

274.    Mr. Walker's team was chronically understaffed and he (together with other senior managers at ERAS) repeatedly raised concerns with SSGX management, including SSGX's head, John Plansky, just to get the staff and resources needed for projects in areas which had already been approved and supported by ERAS's P & L (signed contracts that guaranteed the revenue to support cost and required profit margins of bringing in new personnel).

275.    However, despite the fact that ERAS consistently attained its revenue targets, senior management frequently delayed deployment of required resources, causing Mr. Walker's team to work around the clock to be able to submit the deliverables for which the contracts had already been signed.

276.    By contrast, many other groups in SSGX, including State Street Associates and TruView, had idle resources that were not supported by P&L.  However, due to these groups'

managers being part of the proverbial "Boston club" and maintaining tie-knight connection within the organization senior leadership, the aforementioned units could continue to maintain these resources in their group. At the same time, ERAS, which had been really busy, continued operating understaffed, in view of the fact that ERAS leadership, apparently, had not been accepted into the "Boston club" and did not enjoy its privileges.

277. In view of ERAS's meager resources and limited staffing, Mr. Walker had to shoulder additional responsibilities to provide additional subject matter expertise and quality control of final deliverables, which obviously detracted him from some of the sales efforts.

278. Nonetheless, even with Mr. Walker's assistance, ERAS was, on average, 2-3 staffers short for the duration of his tenure with State Street and no additional tangible support had been provided to assist ERAS with execution.

**State Street Discriminates Against Mr. Walker in its Rush to Dissolve ERAS**

279. Less than a year after Mr. Walker was hired, in October 2017, State Street announced that it was shutting down ERAS completely, as supposedly no longer "strategically relevant" to the Bank. The sudden closure of his entire unit came as a total shock not only to Mr. Walker but all of his colleagues at ERAS. Far from being "strategically irrelevant," Mr. Walker and his teammates all saw that ERAS was a crucial part of State Street's business plan.

280. Mr. Walker knew well that ERAS was very busy with the contracts for execution extending all the way until September 2018. It was hardly imaginable that a unit that, somehow, was not "strategically relevant" had booked 30% of its targeted pipeline for the next year months before the calendar year-end.

281. Moreover, and contrary to the vague "strategically irrelevant" rationale pronounced by State Street senior management, the written summary of Mr. Walker's severance

plan stated that he was subject to Reduction in Force ("RIF") initiative that was based on a variety of specific criteria, including Mr. Walker's performance.

282.    Notably, Mr. Walker's personnel file, which he finally received only after repeated demands, listed yet another—third—reason for his termination that, again, had nothing to do with "strategic relevance" of ERAS.

283.    In the process of termination, State Street discriminated against Mr. Walker, with respect to conditions of his employment at the Bank, on the basis of Mr. Walker's age.  As Mr. Walker subsequently discovered, State Street also discriminated against him on the basis of his age--even at the time the Bank was hiring him.

284.    As a departing employee eligible for severance compensation, Mr. Walker was entitled to receive, among other things, a Special Severance Payment ("SSP"), under the express terms of State Street's severance policies.  For employees who worked at State Street for at least one calendar year at the time of their termination, SSP was calculated on the basis of their year-end bonus from the year immediately preceding their termination.  For employees who, like Mr. Walker, had been with the Bank for less than a year, SSP was calculated in accordance with a formula that took into account average year-end bonuses in that employee "business unit."

285.    Notably, even though Mr. Walker was clearly entitled to an SSP disbursement, State Street initially did not offer it to him at all.  It was only after Mr. Walker's repeated inquiries and demands to the HR department, that State Street eventually agreed with the obvious: Mr. Walker should receive SSP.

286.    The Bank's calculation of SSP, however, did not comport with its own severance policies.

287. As an employee who had not received a year-end bonus in the year immediately preceding my termination, or "Prior Incentive Compensation Award" as the Bank called it in its severance plan, Mr. Walker was still entitled to receive SSP based on a simple formula that takes an "average" bonus given to similarly situated employees in his "business unit" in the prior year.

288. Yet, State Street's definition of "business unit" departed—suddenly and for no good reason (other than shortchanging Mr. Walker)—from its own previous practices. Not surprisingly, under State Street's own (and incorrect) definition and calculation, Mr. Walker's SSP was substantially lower than under the correct definition and calculation.

289. Mr. Walker was hired into ERAS; he reported to the head of ERAS, Mr. Reyngold; and Mr. Walker's compensation was determined according to the salary bands within ERAS.

290. Thus, ERAS should have been, by all measures, Mr. Walker's business unit. In accordance with a simple formula, therefore, Mr. Walker's SSP should have been 50% of the average of last year's bonuses received by ERAS's two other similarly situated employees, Mr. Reyngold and Dr. Shnyra. Under this—the correct—definition and computation, Mr. Walker was entitled to receive $125,000 in SSP compensation.

291. Instead, State Street defined Mr. Walker's "business unit" as *the entire* State Street Global Exchange ("SSGX") department, informing him (without any supporting evidence and only after repeated escalations) that the "average" bonus at SSGX was $130,000 and Mr. Walker was, thus, entitled to $65,000. Notably, State Street has sought to distinguish between SSGX as a "business unit" for the purposes of calculating Mr. Walker's bonus, and ERAS, as a "decisional unit" for the purposes of compliance with the Older Workers Benefits Protection Act ("OWBPA"); and cautioned Mr. Walker from "conflating" the two. The reverse, however, was

true.  ERAS was the correct "business unit" for Mr. Walker.  And SSGX is the only "decisional unit" that made sense for compliance with OWBPA.  Limiting "decisional unit" to ERAS would make it literally impossible for State Street to perform the type of disparate impact analysis required under OWBPA, if indeed the whole unit was subject to termination as per the Bank.

292.    However, wholesale dismantling of a successful group like ERAS, through RIF initiative, was never motivated by "strategic" considerations or by the "variety of broad weighted criteria," or by "B.E.A.C.O.N" as State Street indicated on three different occasions.    Indeed, State Street's constantly shifting rationales for disbanding ERAS were a clear indication that this massive blood-letting was not driven by any business or strategy decisions, but rather by personal animosity of State Street management towards the leadership of ERAS, unfounded and discriminatory in equal measure.

293.    In short, State Street incorrectly computed Mr. Walker's SSP based on a clearly erroneous definition of a critical term that was in violation of the provisions of OWBPA and, conveniently for the Company, substantially undervalued his compensation.

294.    State Street also violated OWBPA by failing to provide Mr. Walker as well as Mr. Reyngold with appropriate disclosures of the rationale for its sudden decision to dissolve the entire ERAS.

295.    As set forth above, the ostensible reason senior management communicated to all employees at ERAS, when making the announcement, was that ERAS was no longer "strategically relevant."   Separately, however, Mr. Walker received a disclosure, required by OWBPA, in which State Street claimed that the wholesale dismantling of ERAS supposedly was based on "a broad range of variably weighted criteria[,] . . . includ[ing] each's professional background, employment history, and job performance, as well as his or her technical,

managerial, and leadership skills, work productivity, demonstrated commitment to teamwork and overall attitude, client relationship, educational and professional achievement, and time in the job." However, when Mr. Walker and his equally situated older colleague (Mr. Reyngold) challenged the reasons for the dismantling of the entire group, State Street admitted, among other things, that it "did not accurately describe rationale" for this momentous decision.

296.    Moreover, in its rush to get rid of ERAS, State Street even violated the black-letter notice provisions of the New York State Workers Adjustment and Retraining Notification ("WARN") Act.  In particular, Mr. Walker received only 60-day notice of termination and not the 90-days' notice mandated by the WARN Act.  *See* NYS Labor Law § 860 *et seq*.  Clearly, the Bank was in such a hurry to push Mr. Walker out the door—that it did not comply with even this simple notice requirement of the WARN Act.

### State Street's Unlawfully Delays Mr. Walker's Hiring Solely Due to His Age

297.    Apart from State Street's unlawful actions with respect to Mr. Walker's termination, the Bank, as Mr. Walker would learn shortly after his wrongful termination, also mistreated and discriminated against Mr. Walker, on the basis of his age—at the time Mr. Walker was hired for his position at the Bank.

298.    More specifically, State Street improperly delayed (well beyond reasonable expectations), Mr. Walker's start date (eventually was set for February 21, 2017) by at least 75 days.

299.    Mr. Walker had stayed in touch with his eventual supervisor, Mr. Reyngold, throughout the remarkably drawn-out onboarding process.  Through the latter, Mr. Walker would learn, early on or in mid-December of 2016, that (a) he had passed all interviews; (b) ERAS would like to hire him as a Managing Director, subject to completion of all internally required

checks; and (c) the HR representative, Dana Hopkinson, would follow up with details, officially, in about a week, as was customary at the Bank with onboarding of a US citizen who is not subject to immigration assessment.  Mr. Hopkinson, however, significantly—and for no good reasons—delayed the hiring process.

300.   On information and belief, this substantial delay, at the hands of Dana Hopkinson, was motivated solely by Mr. Walker's age (as referenced earlier, at the time of his hiring, Mr. Walker was 62-years old), and not by any legitimate business factors.

301.   Moreover, in addition to discriminating against Mr. Walker on the basis of his age, Mr. Hopkinson, again, exhibited a distressing propensity for disparate detrimental treatment of female colleagues, even at the highest echelons of State Street's management.

302.   In particular, even though a senior female executive, the then Head of Innovation and Advisory for SSGX, Dr. Jessica Donohue had approved Mr. Walker's hiring back in December of 2016, Mr. Hopkinson decided to wait until a male executive, James Lowry, became the acting head of advisory business for SSGX in February 2017, and seek additional approval from Mr. Lowry.

303.   Beyond this egregious misconduct, Mr. Hopkinson insisted on expanding the panel of the interviews to consider Mr. Walker's candidacy—once the interview cycle had already completed and, again, for no good reason.  Mr. Hopkison specifically attempted to include the aforementioned Brenda Curran in this interview process—solely to cause further delays.  Mrs. Curran, for her part, had never interviewed anyone seeking employment at ERAS and, on information and belief, had no relevant subject matter or other expertise to conduct such interviews.

304.     Dr. Shnyra sought to circumvent Mr. Hopkinson's illicit efforts to block Mr. Walker's candidacy by raising, with her superiors, concerns regarding Mr. Hopkinson's unauthorized and unwarranted changes in the recruiting process.

305.     Despite Dr. Shnyra's best efforts, Mr. Hopkinson unlawful meddling in Mr. Walker's recruiting process did lead to significant delays with the latter's hiring.

306.     Such unlawful and extreme delays had cost Mr. Walker substantially in foregone salary as well as retirement, and medical benefits.

307.     Discussions with Mr. Reyngold and Dr. Shnyra as well as Mr. Walker's own recollection of interactions with senior management at State Street, have led to the inescapable conclusion that State Street's sudden decision to dismantle ERAS was not motivated by business reasons, but driven by the Bank's desire to cover up its wrongful termination of those two senior executives who had founded and built ERAS from the ground up.

308.     State Street's senior management had exerted undue pressure on Mr. Walker, virtually from the start, and tried, unsuccessfully, to drive a wedge between Mr. Walker, on the one hand, and Mr. Reyngold and Dr. Shnyra, on the other.

309.     In particular, Mr. Lowry, the aforementioned Head of SSGX and Mr. Reyngold's direct supervisor, repeatedly stated to Mr. Walker, in effect, that "ERAS management has ruffled some feathers in the past and if [you] ever have any information to share with [me, you] should not hesitate to reach out."  The first conversation of this sort between Mr. Lowry and Mr. Walker took place even prior to Mr. Walker's start date at ERAS, and then another similar conversation occurred later, in summer of 2017, when Mr. Lowry was visiting New York office. At the time of that visit, Mr. Lowry reiterated to Mr. Walker State Street's interest in collecting compromising information on Mr. Reyngold and Dr. Shnyra.

310.    Needless to say, Mr. Walker was shocked and distressed to see State Street's senior managers plotting against his group's leadership.

311.    In light of the foregoing, Mr. Walker had every good reason to consider his termination and the sudden dissolution of the entire ERAS group (a highly successful, well-functioning unit, by all objective measures) as a culmination of this egregious plotting and vendetta by senior executives against Mr. Reyngold and Dr. Shnyra.

## COUNTS

### Count I
**(*By Ksenia Shnyra against State Street*)**
Gender Discrimination in Violation of Title VII of
the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e-2(a)

312.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 310, above.

313.    Title VII of the Civil Rights Act of 1964, *as amended*, makes it unlawful for an employer, "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

314.    Defendant State Street discriminated against Ksenia Shnyra by treating her differently from her male coworkers, including (without limitation) in unequal compensation,

failure to promote; willful creation of roadblocks to career advancement; deliberate harassment; threats of termination; and, ultimately, wrongful termination.

315.    Dr. Shnyra's sex was the determining factor and/or a motivating factor in State Street's unlawful actions.

316.    As a direct, legal and proximate result of the discrimination, Dr. Shnyra has sustained, and will continue to sustain, economic damages to be proven at trial, but in no event less than  $1,455,000.  As a result of State Street's illegal actions, Dr. Shnyra has suffered emotional distress, resulting in damages in an amount to be proven at trial. Dr. Shnyra further seeks compensatory and punitive damages as well as any other declaratory and monetary relief available for discrimination at trial.

317.    State Street's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Dr. Shnyra's right to be free from discrimination based on sex.

318.    Dr. Shnyra is entitled to reasonable attorneys' fees and costs of this lawsuit.

### Count II
### *(By Ksenia Shnyra against State Street)*
Retaliation in Violation of Title VII of
the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e-3(a)

319.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 317, above.

320.     Section 704(a) of Title VII of the Civil Rights Act of 1964, *as amended*, prohibits employers from discriminating against an employee "because [he or she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

321.    Plaintiff Ksenia Shnyra made informal and formal complaints to State Street's agents and employees opposing the Bank's unlawful, discriminatory employment practices based on sex.

322.   As a result of Dr. Shnyra's complaints, State Street's agents and employees took materially adverse actions against Dr. Shnyra, including (without limitation) failure to promote; deliberate harassment; threats of termination; and, ultimately, wrongful termination.

323.   State Street's adverse actions constituted retaliatory workplace harassment.

324.   The Bank's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

325.   As a direct, legal and proximate result of State Street's retaliation, Dr. Shnyra sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial, but in no event less than $1,455,000.

326.   State Street's unlawful and retaliatory actions were intentional, willful, malicious, and/or done with reckless disregard to Dr. Shnyra's right to be free from retaliation for protected activity.

327.   Dr. Shnyra is entitled to her reasonable attorneys' fees and costs of this lawsuit.

### Count III
***(By Alexander Reyngold against State Street)***
Retaliation in Violation of Title VII of
the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e-3(a)

328.   Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 326, above.

329.   Section 704(a) of Title VII of the Civil Rights Act of 1964, *as amended*, prohibits employers from discriminating against an employee "because [he or she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

330.   Plaintiff Alexander Reyngold, in part, in support of Dr. Shnyra, made informal and formal complaints to State Street's agents and employees opposing the Bank's unlawful, discriminatory employment practices against Dr. Shnyra, based on her gender.

331.    As a result of Mr. Reyngold's complaints, State Street's agents and employees took materially adverse actions against Mr. Reyngold, including (without limitation) failure to promote; deliberate harassment; threats of termination; and, ultimately, wrongful termination.

332.    State Street's adverse actions constituted retaliatory workplace harassment.

333.    The Bank's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

334.    As a direct, legal and proximate result of State Street's retaliation, Mr. Reyngold sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial, but in no event less than $ 1,015,000.

335.    State Street's unlawful and retaliatory actions were intentional, willful, malicious, and/or done with reckless disregard to Mr. Reyngold's right to be free from retaliation for protected activity.

336.    Mr. Reyngold is entitled to their reasonable attorneys' fees and costs of this lawsuit.

### **Count IV**
#### (*By Alexander Reyngold against State Street*)
Age Discrimination in Violation
of the Age Discrimination in Employment Act (ADEA) 29 U.S.C. 623(a)(1)

337.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 335, above.

338.    Section 623(a)(1) of ADEA prohibits employers from discriminating against employees on the basis of employees' age, "with respect to his compensation, terms, conditions, or privileges of employment."

339.    Defendant State Street discriminated against Plaintiff Alexander Reyngold by treating him differently from his younger coworkers, including (without limitation) in unequal

compensation, failure to promote; willful creation of roadblocks to career advancement; deliberate harassment; threats of termination; and, ultimately, wrongful termination.

340. As a direct, legal and proximate result of such discrimination, Mr. Reyngold has sustained, and will continue to sustain, economic damages to be proven at trial, but in no event less than $ 1,615,000. As a result of State Street's illegal actions, Mr. Reyngold has suffered emotional distress, resulting in damages in an amount to be proven at trial. Mr. Reyngold further seeks compensatory and punitive damages as well as any other declaratory and monetary relief available for discrimination at trial.

341. State Street's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Mr. Reyngold's right to be free from discrimination based on his age.

342. Mr. Reyngold is entitled to reasonable attorneys' fees and costs of this lawsuit.

**Count IV**
**(*By Kenneth Walker against State Street*)**
Age Discrimination in Violation
of the Age Discrimination in Employment Act (ADEA) 29 U.S.C. 623(a)(1)

343. Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 341, above.

344. Section 623(a)(1) of ADEA prohibits employers from discriminating against employees on the basis of employees' age, "with respect to his compensation, terms, conditions, or privileges of employment."

345. Defendant State Street discriminated against Plaintiff Kenneth Walker by treating him differently from his younger coworkers, including (without limitation) in unequal compensation, failure to promote; willful creation of roadblocks to career advancement; wrongful termination; unlawful refusal to remit compensation due and owing by virtue of Mr. Walker's separation.

346.    As a direct, legal and proximate result of such discrimination, Mr. Walker has sustained, and will continue to sustain, economic damages to be proven at trial, but in no event less than $225,000.   As a result of State Street's illegal actions, Mr. Walker has suffered emotional distress, resulting in damages in an amount to be proven at trial. Mr. Walker further seeks compensatory and punitive damages as well as any other declaratory and monetary relief available for discrimination at trial.

347.    State Street's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Mr. Walker's right to be free from discrimination based on his age.

348.    Mr. Walker is entitled to reasonable attorneys' fees and costs of this lawsuit.

## Count V
### (By Ksenia Shnyra against State Street)
Gender Discrimination in Violation of
New York State Human Rights Law (NYSHRL), N.Y. Exec. Law § 296(1)(a) and
New York City Human Rights Law (NYCHRL), N.Y. City Code § 8-107

349.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 347, above.

350.    Section 296 of the New York State Human Rights Law ("NYSHRL") prohibits employers from discriminating against individual employees "in compensation or in terms, conditions or privileges of employment" because of "an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status."  N.Y. Exec. Law § 296(1)(a).

351.    Similarly, Section 8-107(1) of the New York City Human Rights Law "(NYCHRL") prohibits employers from discriminating against employees "in compensation or in terms, conditions or privileges of employment" on the basis of, inter alia, "actual or perceived

age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual orientation, uniformed service or alienage or citizenship status."  N.Y. City Code § 8-107.

352.    State Street discriminated against Ksenia Shnyra by treating her differently from her male coworkers, including (without limitation) in unequal compensation, failure to promote; willful creation of roadblocks to career advancement; deliberate harassment; threats of termination; and, ultimately, wrongful termination.

353.    Dr. Shnyra's sex was the determining factor and/or a motivating factor in State Street's unlawful actions.

354.    As a direct, legal and proximate result of the discrimination, Dr. Shnyra has sustained, and will continue to sustain, economic damages to be proven at trial, but in no event less than  $1,455,000.  As a result of State Street's illegal actions, Dr. Shnyra has suffered emotional distress, resulting in damages in an amount to be proven at trial. Dr. Shnyra further seeks compensatory and punitive damages as well as any other declaratory and monetary relief available for discrimination at trial.

355.    State Street's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Dr. Shnyra's right to be free from discrimination based on sex.

356.    Dr. Shnyra is entitled to reasonable attorneys' fees and costs of this lawsuit.

**Count VI**
***(By Ksenia Shnyra Against State Street)***
Retaliation in Violation of
NYSHRL, N.Y. Exec. Law § 296(7) and
NYCHRL, N.Y. City Code 8-107(7)

357.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 355, above.

358.     Section 296(7) of NYSHRL prohibits employers from discriminating against an employee because "he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

359.     Similarly, Section 8-107(7) of NYCHRL prohibits employers from discriminating against employees who have "(i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter."  N.Y. City Code § 8-107(7) (prohibit

360.     Plaintiff Ksenia Shnyra made informal and formal complaints to State Street's agents and employees opposing the Bank's unlawful, discriminatory employment practices based on sex.

361.     As a result of Dr. Shnyra's complaints, State Street's agents and employees took materially adverse actions against Dr. Shnyra, including (without limitation) failure to promote; deliberate harassment; threats of termination; and, ultimately, wrongful termination.

362.     State Street's adverse actions constituted retaliatory workplace harassment.

363.     The Bank's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

364.     As a direct, legal and proximate result of State Street's retaliation, Dr. Shnyra sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial, but in no event less than $1,455,000.

365.     State Street's unlawful and retaliatory actions were intentional, willful, malicious, and/or done with reckless disregard to Dr. Shnyra's right to be free from retaliation for protected activity.

366.    Dr. Shnyra is entitled to her reasonable attorneys' fees and costs of this lawsuit.

**Count VII**
***(By Alexander Reyngold against State Street)***
Retaliation in Violation of
NYSHRL, N.Y. Exec. Law § 296(7) and
NYCHRL, N.Y. City Code 8-107(7)

367.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 365, above.

368.    Section 296(7) of NYSHRL prohibits employers from discriminating against an employee because "he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

369.    Similarly, Section 8-107(7) of NYCHRL prohibits employers from discriminating against employees who have "(i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter." N.Y. City Code § 8-107(7) (prohibit

370.    Plaintiff Alexander Reyngold, in part, in support of Dr. Shnyra, made informal and formal complaints to State Street's agents and employees opposing the Bank's unlawful, discriminatory employment practices against Dr. Shnyra, based on her gender.

371.    As a result of Mr. Reyngold's complaints, State Street's agents and employees took materially adverse actions against Mr. Reyngold, including (without limitation) failure to promote; deliberate harassment; threats of termination; and, ultimately, wrongful termination.

372.    State Street's adverse actions constituted retaliatory workplace harassment.

373.    The Bank's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

374.     As a direct, legal and proximate result of State Street's retaliation, Mr. Reyngold sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial, but in no event less than $ 1,015,000.

375.     State Street's unlawful and retaliatory actions were intentional, willful, malicious, and/or done with reckless disregard to Mr. Reyngold's right to be free from retaliation for protected activity.

376.     Mr. Reyngold is entitled to their reasonable attorneys' fees and costs of this lawsuit.

### Count VIII
**(*By Alexander Reyngold against State Street*)**
Age Discrimination in Violation of
NYSHRL, N.Y. Exec. Law § 296(1)(a) and
NYCHRL, N.Y. City Code § 8-107

377.     Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 375, above.

378.     Section 296 of the New York State Human Rights Law ("NYSHRL") prohibits employers from discriminating against individual employees "in compensation or in terms, conditions or privileges of employment" because of "an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status."  N.Y. Exec. Law § 296(1)(a).

379.     Similarly, Section 8-107(1) of the New York City Human Rights Law "(NYCHRL") prohibits employers from discriminating against employees "in compensation or in terms, conditions or privileges of employment" on the basis of, inter alia, "actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status,

caregiver status, sexual orientation, uniformed service or alienage or citizenship status."  N.Y. City Code § 8-107.

380.    Defendant State Street discriminated against Plaintiff Alexander Reyngold by treating him differently from his younger coworkers, including (without limitation) in unequal compensation, failure to promote; willful creation of roadblocks to career advancement; deliberate harassment; threats of termination; and, ultimately, wrongful termination.

381.    As a direct, legal and proximate result of such discrimination, Mr. Reyngold has sustained, and will continue to sustain, economic damages to be proven at trial, but in no event less than  $ 1,615,000.  As a result of State Street's illegal actions, Mr. Reyngold has suffered emotional distress, resulting in damages in an amount to be proven at trial.  Mr. Reyngold further seeks compensatory and punitive damages as well as any other declaratory and monetary relief available for discrimination at trial.

382.    State Street's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Mr. Reyngold's right to be free from discrimination based on his age.

383.    Mr. Reyngold is entitled to reasonable attorneys' fees and costs of this lawsuit.

### Count IX
**(By Kenneth Walker against State Street)**
Age Discrimination in Violation of
NYSHRL, N.Y. Exec. Law § 296(1)(a) and
NYCHRL, N.Y. City Code § 8-107

384.    Plaintiffs incorporate by reference as if fully set forth herein the allegations contained in paragraphs 1 through 382, above.

385.    Section 296 of the New York State Human Rights Law ("NYSHRL") prohibits employers from discriminating against individual employees "in compensation or in terms, conditions or privileges of employment" because of "an individual's age, race, creed, color,

national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or domestic violence victim status." N.Y. Exec. Law § 296(1)(a).

386.    Similarly, Section 8-107(1) of the New York City Human Rights Law "(NYCHRL") prohibits employers from discriminating against employees "in compensation or in terms, conditions or privileges of employment" on the basis of, inter alia, "actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual orientation, uniformed service or alienage or citizenship status." N.Y. City Code § 8-107.

387.    Defendant State Street discriminated against Plaintiff Kenneth Walker by treating him differently from his younger coworkers, including (without limitation) in unequal compensation, failure to promote; willful creation of roadblocks to career advancement; wrongful termination; unlawful refusal to remit compensation due and owing by virtue of Mr. Walker's separation.

388.    As a direct, legal and proximate result of such discrimination, Mr. Walker has sustained, and will continue to sustain, economic damages to be proven at trial, but in no event less than $225,000. As a result of State Street's illegal actions, Mr. Walker has suffered emotional distress, resulting in damages in an amount to be proven at trial. Mr. Walker further seeks compensatory and punitive damages as well as any other declaratory and monetary relief available for discrimination at trial.

389.    State Street's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Mr. Walker's right to be free from discrimination based on his age.

390.    Mr. Walker is entitled to reasonable attorneys' fees and costs of this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

391.    For lost wages and all other compensation denied or lost to Plaintiffs by reason of Defendant's unlawful actions, in an amount to be proven at trial;

392.    For compensatory damages for Plaintiffs' emotional pain and suffering, in an amount to be proven at trial;

393.    For punitive damages in an amount to be determined at trial;

394.    For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

395.    For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. § 2000e-5(k) and any other applicable laws; and

396.    For such other and further relief as this Court deems just and proper.


Dated: New York, New York
       March 18, 2019

                                        Respectfully submitted,


                                        ___/s/ Mikhail Ratner_____
                                        Mikhail Ratner, Esq.
                                        Peter Roldan, Esq.
                                        EMERGENT LLP
                                        *Attorney for Plaintiffs*

**EXHIBIT 1**

**Pre-Audit Meeting &
Ms. Currant Evidence Fabrication**

Ms. Curran, direct report of Mr. Plansky. arranges a trip to NY  before the pre-audit starts and fabricates a summary for HR use that pre-audit cannot be performed, effectively indicating that it is a "fire for cause."

**Gender
Discrimination &
Harassment Complaint #2**

Dr. Shnyra complains to Mr. Maiuri about gender discrimination and harassment and that she is been squeezed out of the bank and punished for raising concerns. Dr. Shnyra provides tangible evidence of summary meeting minutes with Ms. Curran disproving accusations of failed pre-audit.

**Dr. Shnyra and Mr. Reyngold
Termination**

State Street issues termination letters to Dr. Shnyra , Mr. Reyngold, and Mr. Walker and the rest of ERAS group citing performance reasons and acknowledges that no audit was going to take place. State Street later changes their position claiming that the termination is for "strategic reasons."



| June 27, 2017 | August 28, 2017 | September 1, 2017 | September 8, 2017 | September 9, 2017 | October 3, 2017 |

**Gender
Discrimination
Complaint #1**

Dr. Shnyra raises concerns about gender discrimination and requests investigation

**Mr. Plansky
Harasses Dr. Shnyra &
Pressures Her to Leave the Bank**

Mr. Plansky pressures Dr. Shnyra that she should leave the bank or she will get fired: "there are two ways to get fired at State Street... one is to fail the audit", "you failed the pre-audit according to Ms. Curran"

**Mr. Maiuri  Decides
Based on Pre-Audit Fabricated Results**

Mr. Reyngold reaches out to Mr. Plansky to get support for Ms. Shnyra in the witch hunt arranged by Mr. Plansky and positioning of ERAS within SSGM, as Mr. Maiuri previously offered. Mr. Maiuri comes back stating that  he "needs to understand what happened with pre-audit and meeting with Brenda [Ms. Curran]" before make this decision