K3A9SHND                        Telephone Conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KSENIA SHNYRA, ET AL.,

             Plaintiffs,

        v.                              19-cv-02420-GHW

STATE STREET BANK AND TRUST
CO., INC. ,

             Defendants.
------------------------------x
                                        New York, N.Y.
                                        March 10, 2020
                                        4:04 p.m.

Before:

                  HON. GREGORY H. WOODS

                                           District Judge

              APPEARANCES via Speakerphone

LUMEN LAW
     Attorney for Plaintiffs
BY:  MIKHAIL RATNER

NIXON PEABODY
     Attorneys for Defendant
BY:  DAVID STUART ROSENTHAL
     DAVID ADAM TAUSTER

1             (In chambers)
2             THE COURT:  This is Judge Woods.  Do I have counsel
3    for plaintiffs on the line?
4             MR. RATNER:  Yes.  Mikhail Ratner for plaintiffs on
5    the line.
6             THE COURT:  Thank you.
7             Do I have counsel for defendant on the line?
8             MR. TAUSTER:  Yes, your Honor.  David Tauster and
9    David Rosenthal from Nixon Peabody.
10            THE COURT:  Good.  Thank you very much.  So counsel
11   first thank you for joining this conference on relatively short
12   notice.  I scheduled it for a number of reasons, principally to
13   discuss the pending motion to dismiss that was filed some time
14   ago by defendant in the case.  I've reviewed that motion and
15   the papers submitted together with it I believe that I have a
16   good sense of the issues presented there.
17            Counsel, do either of you wish to add anything to the
18   written submissions that were provided to the court in
19   connection with that motion?
20            First, counsel for defendant?
21            MR. TAUSTER:  No, your Honor.  I think -- other than
22   just noting certainly there was -- if we weren't limited by a
23   page limitation, obviously we probably could have included a
24   bit of additional case law on all of the other points.  But I
25   think we fairly comprehensibly addressed the issues.

1           THE COURT:  Thank you.

2           Counsel for plaintiff, do you have anything that you
3    feel that you would like to add to the written submissions in
4    connection with this motion?

5           MR. RATNER:  Your Honor, I will also rest on my
6    written submissions.  I don't really have any substance to add,
7    your Honor.

8           THE COURT: Good.  Thank you.

9           So counsel, first bear with me.  I'm going to rule on
10   this motion now.  I'm going to do so orally.  Please place your
11   phones on mute.

12          I scheduled this conference to rule on State Street's
13   partial motion to dismiss and to strike.  I will rule on this
14   motion orally.  For the reasons that follow, State Street's
15   motion is denied.  The parties are familiar with the underlying
16   facts and procedural history.  Therefore, I will not recite
17   those in detail.  To the extent that any of the facts alleged
18   in the complaint are pertinent to my decision, those facts are
19   embedded in my analysis.

20          As relevant to this motion, Plaintiffs' complaint
21   pleads claims for gender discrimination under Title VII of the
22   Civil Rights Act of 1964 and analogous provisions of the New
23   York State Human Rights Law ("NYSHRL") and New York City Human
24   Rights Law ("NYCHRL") with respect to Plaintiff Knesia Shnyra.
25   The complaint also pleads claims for age discrimination in

violation of the Age Discrimination in Employment Act ("ADEA") and analogous provisions of the NYSHRL and NYCHRL on behalf of Plaintiffs Alexander Reyngold and Kenneth Walker.

State Street brought this motion seeking dismissal of portions of Plaintiffs' complaint.  Specifically, State Street seeks dismissal of claims asserted as to Shnyra and Reyngold insofar as those claims are predicated on "willful creation of roadblocks to career advancement; deliberate harassment; [and] threats of termination . . . ."  The parties brief, and the Court construes, these claims as hostile work environment claims. State Street also seeks dismissal of the claims that both Shnyra and Reyngold were "wrongful[ly] terminat[ed]" based on their protected characteristics.  In addition, State Street seeks dismissal of all claims asserted on behalf of Walker and moves to strike various allegations in the complaint.

I.   Legal standard.

A.   Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor.  See Palin v. N.Y.

Times Co., 933 F.3d 160, 165 (2d Cir. 2019) (quoting Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017)); Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin., 620 F.3d 146, 150 (2d Cir. 2010).  To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 544).  Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Iqbal, 556 U.S. at 678.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Id. (quoting Twombly, 550 U.S. at 555).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to

draw on its judicial experience and common sense." Id. at 679. In determining the adequacy of a claim under Rule 12(b)(6), a court is generally limited to "facts stated on the face of the complaint." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016).

    B.  Hostile Work Environment.

    To state a claim for a hostile work environment, a plaintiff must "plead facts that would tend to show that the complained of conduct:  (1) is objectively severe or pervasive-that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007).  "Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard." Summa v. Hofstra Univ., 708 F.3d 115, 124 (2d Cir. 2013).  In addition, "[t]he analysis of the hostile working environment theory of discrimination is the same under the ADEA as it is under Title VII."  Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999).

    "Whether the challenged conduct is sufficiently severe or pervasive depends on the totality of the circumstances." Aulicino v. New York City Dep't of Homeless Servs., 580 F.3d 73, 82 (2d Cir. 2009) (quotation omitted).  "The Supreme Court

in [Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)] established a non-exclusive list of factors to consider in this regard:  (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted."  Id. (quotations omitted).  "Ultimately, to avoid dismissal under FRCP 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse, and [the Second Circuit has] repeatedly cautioned against setting the bar too high in this context."  Patane, 508 F.3d at 113.

          C.  Discretionary Discharge.

          To state a claim for discriminatory discharge, a plaintiff must allege that "(1) that she is a member of a protected class, (2) that she was qualified for the position she [held], (3) that she suffered an adverse employment action [such as a discharge], and (4) [that she] can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation[.]"  Littlejohn v. City of N.Y., 795 F.3d 297, 311 (2d Cir. 2015).  "[W]hile the plaintiff ultimately will need evidence sufficient to prove discriminatory motivation on the part of the

employer-defendant, at the initial stage of the litigation-prior to the employer's coming forward with the claimed reason for its action-the plaintiff does not need substantial evidence of discriminatory intent." Id.

D. NYCHRL.

Plaintiffs' NYCHRL claims are subject to a more lenient standard than their federal or state law claims. Although NYCHRL claims had for many years "been treated as coextensive with state and federal counterparts," the New York City Council, in passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), "rejected such equivalence" in favor of a broader remedial scope. Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009). The Restoration Act established two new rules of construction for the NYCHRL: (1) "a 'one-way ratchet,' by which interpretations of state and federal civil rights statutes can serve only 'as a floor below which the City's Human Rights law cannot fall'"; and (2) a requirement that the NYCHRL provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (quoting Restoration Act §§ 1, 7). The Second Circuit has clarified

that these amendments to the Restoration Act require courts to analyze NYCHRL claims "separately and independently from any federal and state law claims." See id. The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Id. (quoting Albunio v. City of New York, 16 N.Y.3d 472, 477-78 (2011)).

II.  Discussion.

A.  Claims related to Ksenia Shnyra.

Plaintiffs have met their minimal burden to plead that Shnyra was subjected to a hostile work environment. Plaintiffs allege that Shnyra suffered deliberate harassment from Dana Hopkinson, a State Street employee in the Human Resources Department. The complaint alleges that Shnyra received less favorable treatment than did her male colleagues, including that Hopkinson used "demeaning language and threats" that were both "overt and veiled" in "his communications with Dr. Shnyra and a female external recruiter, while never permitting such language in communications with male colleagues and associates." Complaint, Dkt No. 1, paragraph 102; see also id. (alleging that Hopkinson treated Shnyra less favorably than her male colleagues in other ways). The complaint further alleges that Shnyra raised her concerns in a request to HR that State Street "launch an official investigation into her complaints" but that State Street did not do so. Id. Paragraph 105.

        The complaint also alleges that Plaintiff suffered harassment after John Plansky and James Lowry became her direct supervisors.  Id. Paragraph 115.  Plaintiffs plead that when Plansky and Lowry became Shnyra's direct supervisors, her "responsibilities were dramatically reduced" and "she was removed from all decision-making activities within ERAS[.]"  Id.  Paragraph 117.  Plaintiffs allege that State Street's management designed a plan to push her out of State Street by creating work for her unit in the form of a "pre-audit" to which other units were not subjected.  Id. paragraphs 121-29.  The complaint also alleges that when Shnyra "sought additional information and clarification of the 'pre-audit' process," Plansky "intimidated and threatened Dr. Shnyra with termination, demeaned her, and questioned her professional acumen and loyalty."  Id.  Paragraphs 133-34.  The complaint specifically alleges that Shnyra had "several in-person and phone conversations" with Plansky from July through September of 2017 during which he "us[ed] highly inappropriate and profanity-laced language to insult Dr. Shnyra, personally and professionally."  Id.  Paragraph 135; see also id.  Paragraph 137 (describing the details of a call between Plansky and Shnyra).  Allegedly, as a result of a conversation with Plansky, Shnyra suffered "stress-induced anaphylactic shock for which she had to be treated with steroids."  Id.  Paragraph 138.  The complaint further alleges that Shnyra "lapse[d] into"

1   and was "diagnosed with" both "clinical depression" and
2   "Post-Traumatic Stress Disorder ('PTSD')," which was allegedly
3   "caused" by the working conditions to which Shnyra was
4   subjected.  Id.  Plansky repeatedly threatened to terminate
5   Shnyra.  Id.  Paragraph 142.  Shnyra alleges that Plansky's
6   "personal attacks on her" had "nothing to do with the quality
7   of Dr. Shnyra's work" but rather that Shnyra was "singled out
8   because of her gender."  Id. paragraph 144.
9           These allegations are sufficiently detailed and
10  specific to meet the pleading standard on this motion to
11  dismiss.  Plaintiffs have no trouble meeting the first two
12  elements of a hostile work environment claim; the complaint
13  amply alleges that Defendants' conduct was so severe and
14  pervasive that a reasonable person would have found the work
15  environment hostile, see, e.g., id.  Paragraphs 102 (alleging
16  that Hopkins threatened Shnyra), 135 (alleging that Plansky
17  repeatedly used highly inappropriate language), and that Shnyra
18  subjectively perceived it as such.  State Street argues only
19  that Shnyra has not adequately pleaded that she was treated
20  less well because of her gender.  However, at the motion to
21  dismiss stage, Shnyra need only plead facts that "give
22  plausible support to a minimal inference of discriminatory
23  motivation" to survive a motion to dismiss.  Littlejohn, 795
24  F.3d at 311.  Plaintiffs have met their "minimal burden to show
25  discriminatory intent," id., by pleading that Shnyra's male

colleagues did not suffer the same adverse treatment to which she was allegedly subjected. Especially given the complaint's allegations that Shnyra was a top performer at State Street, it is plausible to infer that Shnyra's supervisors were motivated at least in part by discriminatory animus. Because Plaintiffs' claims under federal and state law survive, their NYCHRL claim also survives. See Mihalik, 715 F.3d at 109.

Plaintiffs have also met their burden to allege that Shnyra was discriminatorily discharged. State Street does not challenge that Shynra is a member of a protected class, that she was qualified for the position she held, or that she was discharged. State Street argues only that Plaintiffs have not pleaded facts to sustain their minimal burden of suggesting a discriminatory motivation. This argument is not persuasive; Plaintiffs have pleaded that the unit was disbanded just one day after the allegedly arduous "pre-audit" process was completed and "a month after Dr. Shnyra had complained about Mr. Plansky's egregious and discriminatory misconduct to his direct supervisor." Complaint Paragraph 150. Plaintiffs also allege that prior to the date the unit was disbanded, "State Street's long-term plans included a dramatic expansion of ERAS' staff, not its complete dissolution." Id. Paragraph 155. The complaint also alleges that State Street Global Markets "eventually ask[ed]" an outside consultant, Deloitte, "to hire SSGX personnel to continue with the same projects ERAS was

engaged on, but this time through Deloitte."  Id.  Paragraph 162.  These allegations and others in the complaint-especially coupled with the allegations that Shnyra was subjected to a hostile work environment based on her gender as discussed above-give rise to a plausible inference of discriminatory intent.  If, for example, State Street ultimately believed that the work done by ERAS was strategically relevant enough that it hired an outside consultant to perform that work after it disbanded ERAS and had planned on scaling up ERAS until just before it made the decision to disband the unit, it is plausible to infer that discrimination against Shnyra based on her gender may have been a motivating factor in that decision.

        To reiterate, plaintiffs face a minimal burden at the motion to dismiss stage.  The allegations in the complaint meet that minimal burden.  Again, because Plaintiffs' federal and state law claims survive, their NYCHRL claims related to the discriminatory discharge of Shnyra likewise survive.  See Mihalik, 715 F.3d at 109.

        B. Claims Related to Mark Reyngold.

        Plaintiffs have adequately pleaded that Reyngold was discriminatorily discharged.  Plaintiffs allege that after State Street disbanded ERAS, it rehired or attempted to rehire other workers-i.e., workers other than the plaintiffs in this litigation, all of whom were also over forty-to perform the same functions that they had performed before it disbanded the

group.  See Complaint Paragraph 261.  This supports a plausible inference that State Street's stated rationales for disbanding ERAS were not its true rationales; if State Street sought to hire back most, or even all, of the workers other than Plaintiffs to perform similar functions, that supports the inference that State Street did not disband ERAS for legitimate business reasons but rather because of discriminatory animus against Plaintiffs.  Moreover, Plaintiffs allege that State Street's purported rationale for disbanding ERAS shifted over time, see, e.g., id.  Paragraph 247, and that State Street admitted that it had not "accurately describe[d] the rationale" for the decision.  Id. Paragraph 249.  Again, these actions support the plausible inference that State Street's rationales were not its true rationales and the further inference that the true motivation for disbanding ERAS was discriminatory animus against Plaintiffs, including discriminatory animus based on age against Reyngold.  Based on these facts and others alleged in the complaint, Plaintiffs have met their minimal burden to raise a plausible inference of discriminatory animus related to Reyngold's discharge.  The NYCHRL claim related to the discharge of Reyngold likewise survives.  See Mihalik, 715 F.3d at 109.

Plaintiffs also allege that Reyngold was subjected to a hostile work environment and discriminatorily discharged based on his age in violation of the ADEA and analogous state

1    and city law provisions.  I've just discussed the
2    discriminatory discharge elements of the claim.  Whether
3    Plaintiffs have alleged sufficient facts to sustain a hostile
4    work environment claim as to Reyngold is questionable.  There
5    is a substantial question as to whether a reasonable person
6    would have found the working environment Reyngold was subjected
7    to as State Street, as alleged in the complaint, to be
8    sufficiently hostile or abusive.  The allegations in the
9    complaint with respect to Reyngold contrast sharply with the
10   allegations with respect to Shryna, who alleges that her
11   supervisors threatened and demeaned her.
12           Ultimately, the Court need not decide whether Reyngold
13   has successfully stated a hostile work environment claim
14   because State Street does not seek to dismiss the entirety of
15   Reyngold's age discrimination claims under federal, state, or
16   city law.  A hostile work environment theory of liability is
17   just that:  one theory plaintiffs can use to prove an age
18   discrimination claim.  Here, hostile work environment is not
19   pleaded as a separate cause of action.  Plaintiffs describe
20   this aspect of the claim as "pleading in the alternative."
21   Opposition at 10.  Defendant is not asking the Court to dismiss
22   a cause of action but to dismiss a theory of liability.  Even
23   if the Court were to dismiss this theory of liability,
24   Plaintiffs' complaint would still contain an ADEA claim and
25   analogous state and city law claims.  The motion does not

narrow case at all.  The Court does not expect that it would preclude Plaintiffs from asserting a hostile work environment claim if the evidence produced in discovery supported the assertion of such a claim.  Hence, because State Street does not seek to dismiss the entirety of Reyngold's age discrimination claims, the Court declines to dismiss plaintiffs' hostile work environment theory at this time and expects to address that theory of that claim on summary judgment.

         C.  Claims related to Kenneth Walker.

         Plaintiffs have met their burden to plead that Walker was discriminated against based on his age.  As noted above, Plaintiffs plead that ERAS was disbanded and that State Street then hired or attempted to rehire other employees to perform the same job functions they had performed as members of ERAS, id.  Paragraph 261, and that State Street's rationale for disbanding ERAS shifted over time.  Id.  Paragraphs 247, 249. Because Reyngold and Walker are both over forty years old, the inferences described above apply equally to both men. Moreover, Plaintiffs plead that Walker's start date was substantially delayed as a result of Hopkinson's discriminatory animus toward older workers.  Id.  Paragraph 300.  Although State Street argues that this allegation is insufficient because it is based "upon information and belief," the Court does not agree.  State Street overlooks the fact that the

1  complaint alleges that there was no legitimate business reason
2  for delaying Walker's start date.  That allegation renders
3  plausible the inference that Hopkinson acted with
4  discriminatory animus against Walker based on his age.  This is
5  sufficient to create a minimal inference that employees of
6  State Street, including Hopkinson, acted with discriminatory
7  animus toward Walker, and that is all that is required to
8  sustain an age discrimination claim at the motion to dismiss
9  phase of this litigation.
10             D. Motion to Strike.
11             Defendants' motion to strike is also denied.  Rule
12  12(f) of the Federal Rules of Civil Procedure provides that
13  "the court may order stricken from any pleading . . . any
14  redundant, immaterial, impertinent, or scandalous matter."
15  "The courts should not tamper with pleadings unless there is a
16  strong reason for so doing.  As such, motions to strike are
17  generally disfavored.  Moreover, unless it is clear that the
18  allegations in question can have no possible bearing on the
19  subject matter of the litigation, motions to strike allegations
20  in the pleadings should be denied."  Quanta Specialty Lines
21  Ins. Co. v. Investors Capital Corp., 2008 WL 1910503, at *4
22  (S.D.N.Y. April 30, 2008) (quotations omitted).  "[A]  movant
23  must meet a high bar to prevail on" a motion to strike.  Muench
24  Photography, Inc. v. Houghton Mifflin Harcourt Publishing
25  Company, 2015 WL 4757601, at *3 (S.D.N.Y. August 12, 2015)

(citations omitted).  Here, the Court has concluded that there is not a strong reason to strike the allegations identified by State Street from the complaint.  Accordingly, State Street's motion to strike is denied.

Thank you, counsel, for your patience as I read through that decision.

I'll issue a separate order than denies the motion and points to the transcript at today's conference to provide the Court's reasoning with respect to that decision.

Counsel, you likely saw that I issued an order scheduling an initial pretrial conference in this case.  I scheduled it in the near future because it appears that you've not yet had an initial pretrial conference from my review of the docket.

Please let me know now if that's wrong.  I'd like to get you up and running as soon as possible if you haven't already begun.

Again, I note that this motion to dismiss was partial and that the effect of it was really not substantial.  It did not narrow the issues for discovery at all.  So I am sorry if you haven't begun discovery yet but we'll get you started in the near term.

Counsel, anything that I should be aware of at this point regarding the status of the case?

Again, we'll be having an initial pretrial conference

1  shortly so don't feel obliged to tell me everything about the
2  case now.
3           Let me turn first to counsel for plaintiffs.
4           MR. RATNER:  I don't have anything to add, your Honor,
5  except for one housekeeping matter.  The conference scheduled
6  on April 1, I'm not sure whether it was in person or by
7  telephone.  But to the extent that the events with corona virus
8  affect and spread, I have an elderly father who I, while not
9  take care of all the time, I check up on him and he's frail so
10 I would -- if it's possible to have it over the phone, I would
11 prefer to do that but I will, you know, I can also advise the
12 court closer to the date whether that's something that needs to
13 be done.
14          THE COURT:  Thank you.
15          That's not a problem.  I normally do only have initial
16 pretrial conferences in person but I've begun to hold them
17 telephonically so I'm happy to embrace that request.
18          The one thing that I would encourage the parties to
19 do, however, is to talk, among other things, about potential
20 resolution of the case.  It's one of the topics that I'll
21 discuss with you at the initial pretrial conference.  One of
22 the unfortunate aspects of not being able to meet in person is
23 you won't have the opportunity to meet and talk about the case
24 in person and that way which I think can be valuable.  So I'd
25 ask that you try to engage in a conversation not only about the

1    scheduling for the conference itself and the required
2    preconference submissions but also that you talk expressly
3    about the prospect for a resolution of the case.
4             So anything on your side, counsel for defendant?
5             MR. TAUSTER:  Just to clarify, your Honor, are you
6    saying that there's not going to be a written decision issued?
7    We would have to order the transcript if you we wanted to
8    obtain that?
9             THE COURT:  Correct.
10            MR. TAUSTER:  OK.
11            THE COURT:  Thank you very much.  Thank you all.
12            (Adjourned)