K5LLSHNC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

KSNEIA SHNYRA *et al.*,

                    Plaintiffs,

          v.                            19 Civ. 2420 (GHW)


STATE STREET BANK and TRUST
COMPANY, INC.,
                                        Teleconference

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        May 21, 2020
                                        1:00 p.m.

Before:

                    HON. GREGORY H. WOODS,

                                        District Judge


                         APPEARANCES

LUMEN LAW
     Attorney for Plaintiffs
BY:  MIKHAIL RATNER

NIXON PEABODY
     Attorneys for Defendants
BY:  DAVID S. ROSENTHAL
     DAVID A. TAUSTER

K5LLSHNC

| | |
|---|---|
| 1 | THE COURT:  This is Judge Woods.  I apologize for |
| 2 | starting late.  Let me say a few words of introduction at the |
| 3 | outset.  Give me a moment, please. |
| 4 | (Pause) |
| 5 | THE COURT:  Good.  So first a few words about the |
| 6 | correct protocol.  First, please state your names each time |
| 7 | that you speak during the course of this conference.  Do that |
| 8 | regardless of whether or not you've spoken it previously. |
| 9 | Second, please keep your phones on mute at all times when |
| 10 | you're not speaking that's to keep us from hearing unnecessary |
| 11 | background noise.  So please keep your phones on mute.  Third, |
| 12 | I'm asking the court reporter to let us know if she has any |
| 13 | difficulty in hearing or understanding anything that any of us |
| 14 | say here today.  So please don't be surprised if she speaks up. |
| 15 | If she does, please do what she asks so that we can keep a |
| 16 | clear record. |
| 17 | So with that, who do I have on the line for plaintiff? |
| 18 | MR. RATNER:  Your Honor, Mikhail Ratner, for |
| 19 | plaintiffs. |
| 20 | If you need me to spell my first and last name, it's |
| 21 | M-i-k -- |
| 22 | THE COURT:  It's not necessary. |
| 23 | Who do I have on the line for defendants? |
| 24 | MR. TAUSTER:  Good afternoon, your Honor. |
| 25 | You have David Tauster.  And I believe you also have |

K5LLSHNC

 1    David Rosenthal from Nixon Peabody.

 2              MR. ROSENTHAL:  That's right.  This is David

 3    Rosenthal.  I am here.

 4              THE COURT:  Good.  Thank you.

 5          So first we're here for an initial pretrial

 6    conference.  The agenda for the conference is straightforward.

 7    First I'm going to give you the opportunity to let me know if

 8    there are any facts or legal issues that you'd like to

 9    highlight for me.  Second, we're going to discuss the process

10    that we're going to be using to litigate the case going

11    forward.  So that portion of the conference I expect to look to

12    the parties' proposed case management plan and scheduling order

13    to provide the framework for our conversation.  And I hope to

14    discuss what, if anything, I can do to facilitate an amicable

15    resolution of the case.  So with that agenda at hand, let me

16    turn first to counsel for plaintiffs.

17          What would you like to tell me about the case?

18              MR. RATNER:  Your Honor, I think -- I hesitate to say

19    anything more than what's written in the complaint and

20    your Honor's decision on the motion to dismiss exhibited close

21    to familiarity with the facts and circumstances of this case.

22    If the Court would like, I can refresh the recollection of

23    everybody.

24          But it's an unusual case in the sense of my client --

25    the entire department that housed my client was disbanded to

K5LLSHNC

1    cover up a wrongful termination.  And that, in essence, is the

2    central elastic of this case:  State Street disbanded suddenly

3    a 17-person department.  We allege that a good chunk of the

4    folks, if not all of them, were subsequently offered jobs.

5    Some of them actually were retained back; my three clients were

6    the only ones who weren't.  And it followed on the hills of a

7    complaint made by the central player in this case, Dr. Ksenia

8    Shnyhra, and of gender discrimination.  And subsequently, her

9    close colleague and another managing director of the unit,

10   Alexander Reyngold, basically confirmed her complaint, stood up

11   with her, and both were terminated.  And a third person -- and

12   my client -- Kenneth Walker, was also terminated and not

13   offered a job back based on the fact that he was over 40.  That

14   is, in essence, what we have here, your Honor.

15            I have not seen anything from defendant by way of, you

16   know, good business reason for terminating an entire department

17   like that.  In fact, up until the very -- pretty much a couple

18   months until the department was disbanded, my clients,

19   especially Dr. Shnyra and Mr. Reyngold, were bandied about as

20   sort of paragons of success and commitment to the State Street

21   defendant's business model.  And all of a sudden, this

22   aboutface that happened a couple months later, it was clearly

23   tied to, you know, the events that precipitated the complaints

24   by Dr. Shnyra.

25            So that's, in a nutshell, what this case is about,

K5LLSHNC

1      your Honor.

2                THE COURT:  Okay.  Thank you.

3                Let me just ask briefly about one issue raised in the

4      letter submitted by the parties, which relates to the focus of

5      your claims.  Counsel for defendant points to the plaintiffs'

6      failure to apply for the newly opened positions and points to

7      well-supported jurisprudence that one must apply for a job in

8      order to be -- in order to state a claim for having been denied

9      that job.

10                Can you comment on that, and in particular on whether

11      that is the focus of your claims here; in other words, the

12      failure to hire?

13                MR. RATNER:  Well, it's a combination of the factors

14      that the entire department was disbanded suddenly and most of

15      the folks were subsequently rehired -- or so we allege at

16      least.  My clients have some evidence to that effect already.

17      My clients were actively discouraged -- we'll present

18      evidence -- from doing anything in terms of trying to reinstate

19      themselves within State Street.  And I can't imagine there

20      being anything that could possibly -- would prompt them to

21      actively pursue employment with State Street after what had

22      happened just, you know, weeks before the entire department was

23      disbanded.  My client, Dr. Shnyra, was so denigrated and so

24      discouraged that she suffered, you know, an anaphylactic shock

25      and was hospitalized.  And there were other health issues that

K5LLSHNC

1    followed at or around the time that we're talking about.

2           But they did make an attempt to try to -- in emails

3    themselves, I may add, your Honor -- that's something that

4    we'll present in discovery.  In the emails themselves, they

5    repeatedly say, you know, We want to resolve this issue, we

6    want to be good citizens to State Street.  And after they were

7    let go, the communication chain was cut immediately.  So there

8    really isn't anything by way of emails, I think, subsequent to

9    that.  The job postings were internal to State Street, and it

10   actually didn't go outside of its own internal network to place

11   these people back into positions that they pretty much occupied

12   during the time that they were still with the department that

13   was sacked.

14          So, yes, I understand the defendant's point that you

15   have to apply for a job in order for you to claim that you were

16   denied it, but in this case, I think what's happened is that

17   the entire department was sacked, and then everybody was kind

18   of quietly were placed -- were offered positions.  My clients

19   tried to do something about it even before the department was

20   sacked, but, you know, subsequent to that, they didn't really

21   aggressively pursue an employment opportunity in a way that

22   drove them to the position that they find themselves right now.

23          THE COURT:  Thank you.  That's helpful.

24          Of course, the parties' positions will evolve as you

25   seek it for the course of discovery in this case.  At this

K5LLSHNC

1    point, I understand that plaintiffs are not principally

2    pursuing this as a failure-to-hire claim but, rather, that the

3    rehiring allegations are in support of the contentions that the

4    termination of them was pretextual because other people were

5    hired back.  Good.

6            Anything else that you'd like to tell me, could

7    counsel for plaintiffs, before I turn to counsel for defendant?

8            MR. RATNER:  I just -- I think, your Honor, you'll

9    find in this case that -- especially with Dr. Shnyra -- that

10   it's an example of where, you know, discrimination at the

11   workplace is really a public health issue as much as it is also

12   a week-old nightmare.  And she has suffered tremendously

13   because of what has happened to her during the time that we're

14   talking about.  Other than that -- and that's why we're looking

15   to present expert testimony from doctors, or at least in some

16   form, go through discovery on this issue.  There are some

17   serious health issues that we have just -- I'm reluctant to

18   talk about them right now at this point, but that will be

19   whetted out through discovery.

20           THE COURT:  Good.  Thank you.  Let me turn to counsel

21   for defendant.

22           What would you like to tell me about the case?

23           MR. TAUSTER:  Good afternoon, your Honor.  This is

24   David Tauster, Nixon Peabody.

25           I think, his description that this is a -- I think he

K5LLSHNC

1    said -- unique or odd case is apt, because we do think it is

2    very odd and very unique that plaintiffs believe that they can

3    support a discrimination claim where an entire department of

4    individuals -- old and young, male and female, all races,

5    etc. -- were discharged.

6          The plaintiffs were a part of State Street's group

7    known as Enterprise Risk Advisory Services.  They performed the

8    kind of quantitative risk modeling for businesses that I could

9    never hope to understand, but which is apparently somewhat

10   commonplace.  State Street at one point did look at this as a,

11   you know, useful part of this operation.  By the same token,

12   however, all the risk modeling performed by this unit known as,

13   ERAS, was all performed internally.  I think they might have

14   done one external project the entire time they existed.  So

15   realistically, this was not an revenue-generating sector, but

16   rather, just an in-house service.  Over time, State Street

17   realized that it was not realizing the type of gains from

18   having the type of services inhouse that it could have realized

19   from farming them out to similar companies and, therefore,

20   elected to eliminate the ERAS group.

21         Plaintiff's allegations about discrimination

22   harassment before that happened, those are all baseless.  You

23   know, at the end of the day -- you know, plaintiffs' counsel

24   has spoken at length about Dr. Shnyra -- Ksenia Shnyra,

25   plaintiff here -- and to a certain degree Dr. Shnyra, went out

K5LLSHNC

1    of her way to be aggressive and abrasive to her colleagues, but

2    needless to say, was never subjected to any form of

3    discrimination, harassment, or anything of the sort during her

4    employment.  And frankly with respect to Plaintiffs Walker and

5    Reyngold, their claims are completely absurd here.  There's

6    nothing really to support that Plaintiff Reyngold actively

7    supported any complaints that were made by Dr. Shnyra.  To the

8    contrary, Reyngold complained, frankly, you know, that they

9    were not protected activity; they were Reyngold complaining to

10   the supervisor about why he wasn't making more money and being

11   promoted.  But needless to say, again, he was eliminated as a

12   part of the universal reduction and not due to any complaints

13   or anything of that sort.  And Plaintiff Walker, frankly, does

14   not allege that he made any complaints.  He was hired into

15   ERAS, he was discharged, and it's as simply as that.  There's

16   really nothing to his claim other than that he was hired when

17   he was over 40, and he was fired when he was over 40.

18          So needless to say, State Street believes it has a

19   very defensible position in this litigation.  And while we

20   understand that the Court believed that plaintiff stated a

21   claim, State Street is very confident that it will prevail in

22   this litigation whether at summary judgment or at trial.

23          THE COURT:  Good.  Thank you very much.

24          So let's talk about discovery here.  I've reviewed the

25   parties' proposed case management plan and scheduling order.

1    I'd like to hear from the parties about your expectations for

2    discovery here.  I'm interested in information about the kind

3    of issues that will inform my assessment of the deadlines that

4    the parties have proposed.  That's particularly the case here

5    where the parties have suggested a relatively extended

6    discovery schedule.  So I'd just like to make sure that I

7    understand what it is that you expect to be doing and how it is

8    that you expect to complete that work within the time frame

9    that you have proposed.  So let me begin first with counsel for

10   plaintiffs.

11        Counsel, what can you tell me about your expectations

12   for discovery here?

13        MR. RATNER:  Well, your Honor, I think we'll be

14   seeking documents related to my client's employment at State

15   Street, as well as any information related to ERAS department

16   group, leading up to its disbandment and subsequent.  So kind

17   of a short window in which we'll be asking for documents that

18   are beyond sort of the personnel files.

19        And then we plan, on the basis of the documents that

20   we do receive, to depose several members of -- you know,

21   supervisors to the extent that they still obviously are under

22   State Street control.  And then if necessary, we will, you

23   know, look to subpoena them otherwise for sort of instrumental

24   in the misconduct that we're talking about here; some of them

25   named already in the complaint.  And that majority in the

K5LLSHNC

1    complaint already as the officers and directors who were direct

2    supervisors who were maybe ERAS, but still played an integral

3    part in this case.  And we will be seeking to present evidence

4    of damages to my clients as well.

5            The other thing -- the elephant in the room,

6    your Honor, if I may say so -- is the fact that we're going

7    through these extraordinary times.  I am not against --

8    obviously documents exchange will take place electronically.  I

9    can't imagine -- even if it's an enormous amount of data and

10   documents, we'll figure out how to exchange things

11   electronically, because right now I don't have access to my

12   office, for example, and I'm not sure when that's going to

13   change.  And I suggest we address these issues, as they've done

14   now, and not worry about what's happening a month or two from

15   now.

16           And the other thing is depositions and litigation

17   practice.  I have scheduled several depositions.  I haven't

18   taken them over the Zoom, but, you know, I understand that

19   that's something that's, you know, going to be common practice

20   until at least the time that we can safely assemble and

21   whatnot.  And especially because some of the parties -- not

22   parties, pardon me -- witnesses are located in Boston, it may

23   be easier for us to do it this way.  But I will, of course,

24   look to the Court for guidance as to ultimately what's going to

25   happen here.

K5LLSHNC

1      So that's what my view of the case is and procedure.

2      THE COURT:  Good.  Thank you.

3      Let me ask briefly, counsel for plaintiff, about your

4  expectations for expert discovery here.  You've mentioned, for

5  example, serious medical consequences of the alleged conduct by

6  defendant here.

7      What can you say about your expectations for expert

8  discovery?

9      MR. RATNER:  I think what I'm looking to do is to

10 present evidence of how the stress of what Dr. Shnyra was going

11 through had caused -- had contributed significantly seriously

12 to several physical conditions that she had suffered from,

13 health issues.  And, you know, there's no question that she had

14 them and she has them, and they came about around the time --

15 she didn't have anything prior to that.  So I will tie in the

16 timeline with the diagnosis and the sort of subsequent

17 development of these conditions, you know, to the issue of to

18 what extent the enormous stress had contributed to development

19 of these conditions.

20     THE COURT:  Thank you.  Good.  I appreciate that.

21 Thank you.

22     Counsel for plaintiffs, have the parties discussed ESI

23 and, in particular, issues such as search terms and custodians?

24     MR. RATNER:  No, your Honor, we have not discussed

25 these as of yet.

1              THE COURT:  Good.  Thank you.

2              Let me turn to counsel for defendant.

3              Counsel, what can you tell me about your expectations

4    for discovery here?

5              MR. TAUSTER:  Thank you, your Honor.  This is David

6    Tauster from Nixon Peabody.

7              Plaintiff, I think accurately summarized some of the

8    challenges that we expect to face in discovery here.  Again, I

9    don't need to remind everyone that we're dealing with a global

10   pandemic.  And, you know, as plaintiff's counsel noted, we have

11   the defendant primarily headquartered in Boston, plaintiffs

12   headquartered in New York.

13             What I can see being some of the challenges here

14   warranting a bit longer discovery schedule, and even -- taking

15   a step back here, I think it's worth noting that it's somewhat

16   obvious that this is a very long and dense complaint.  I know

17   plaintiff indicated that he's only focused on, you know,

18   immediately proceeding the discharges and thereafter, but there

19   are allegations in this complaint that go back some time in

20   terms particularly of the disparate treatment allegations and

21   things of that sort.

22             So certainly document collection is going -- you know,

23   in and of itself would have been a challenge.  And that's

24   before factoring in that this collection will have to have been

25   completely remotely.  So we are going to have to deal with

K5LLSHNC

1    that.

2            We suspect that there may be some discovery --

3    considerable discovery that plaintiffs will be seeking that we

4    will be resisting.  As we brief the Court in our motion to

5    dismiss, we believe that there are multiple allegations in this

6    complaint that should have been stricken.  We understand the

7    Court disagrees, but by the same token, we will likely resist

8    discovery, you know, to the extent that plaintiffs intend to

9    seek discovery relating to those issues, completely unrelated

10   claims of race discrimination, things of that sort.  So we can

11   see some challenges arising just as we get through the exchange

12   of written discovery, processing of documents, etc., and then

13   ultimately culminating in depositions.

14            Obviously, as plaintiff's counsel pointed out, remote

15   depositions are going to become an increasing reality in the

16   legal practice and, who knows, they may take over and become

17   the dominant means of taking depositions.  By the same token, I

18   will say that building in extra time into the schedule, such as

19   the parties can get to the poll when they're taking

20   depositions, it is my hope -- and maybe I'm just way too

21   optimistic, but perhaps we might be able to take the

22   plaintiffs' deposition in person just because I find that helps

23   in terms of assessing demeanor and things of that sort.

24            So ultimately, even if there was not a pandemic, I

25   think that this might be the type of somewhat complex case that

K5LLSHNC

would warrant more time to complete discovery.  But certainly,
given the current global circumstances, we would appreciate the
Court so ordering of the case management plan so we can have
the time we need rather than having to come running back to the
Court and ask for more time.

Thank you, your Honor.

THE COURT:  Thank you very much.

So first, counsel, thank you for your comments.
Second, I've reviewed the proposed deadlines in the proposed
case management plan and the scheduling order in light of your
comments.  And I believe that, with one small exception, the
deadlines that the parties have proposed are acceptable.  They
are reasonable and provide sufficient time for the parties to
complete whatever necessary to litigate this case.

Let me begin with the first small exception.  That
relates to paragraph 7F.  I believe that the date needs to be
advanced to October 18, just one day from the current deadline,
in order to give you the full 30 days to respond to requests to
admit within the discovery period.  So I propose to modify
paragraph 7F, to give you that full 30 days prior to the
November 17 date for completion of fact discovery.

Is that modification acceptable to you, counsel for
plaintiffs?

MR. RATNER:  Yes, your Honor.

THE COURT:  Good.  Thank you.

K5LLSHNC

1           Counsel for defendant?

2           MR. TAUSTER:  Your Honor, I just want to note that the

3    reason we went with October 19th rather than the 18th is that

4    October 18th is a Sunday.

5           THE COURT:  Understood.

6           So let's push it even -- let's leave it as the 18th.

7    I hope that you'll do it before the 18th --

8           MR. TAUSTER:  Fair enough, your Honor.

9           THE COURT:  -- so that you don't get caught up with

10   that.  Thank you, counsel.  Good.

11          So let me say a few words about the case management

12   plan and scheduling order just to inform how it is that you

13   approach the issues raised.

14          First, you should exchange your HIPAA-complaint

15   medical records releases no later than the date that is

16   specified in the case management plan.  Indeed, I would

17   recommend that they be provided sooner than that if possible.

18   As I understand it, based on the proffers by counsel here and

19   the facts alleged in the complaint, plaintiff is putting in

20   issue her medical condition and is arguing that the results of

21   the alleged misconduct have exacerbated previously existing

22   medical conditions.  That appears to put at issue her medical

23   history with respect to those issues, but may underscore those

24   claim damages.  So I expect that the defendants will want and

25   will seek records releases for the relevant treatment

K5LLSHNC

1    providers.  I direct you to provide those records releases by

2    the date specified in the case management plan.  That can be a

3    bottleneck.  I've heard from others that that can particularly

4    be a bottleneck in the face of the pandemic, where medical

5    professionals may have other better things to do than providing

6    documents in connection with litigation.  So I strongly

7    encourage you to take care of that issue promptly so that it is

8    not a bottleneck.  Please focus on that.

9           The second thing that I want to highlight is that I

10   believe that these deadlines are reasonable and that they

11   provide a sufficient time for the parties to complete

12   discovery.  I want to highlight that the deadlines are real

13   deadlines and that they are, as written, deadlines for

14   completion of discovery.  So, for example, paragraph 7A says

15   that "all fact discovery shall be completed no later than

16   November 17, 2020."  That word, "completed," shows my

17   expectation that discovery will be completed by that date.

18   "Completed" means no more of it after that date.  So please

19   keep that general rule in mind as you're conducting discovery.

20   There are a number of corollaries that flow from that general

21   rule.  I'm going to highlight two of them right now, but there

22   are others which I'll leave for you to extrapolate on your own.

23          The first that I want to highlight is that, because

24   this is a real deadline and a deadline for completion of

25   discovery, you should not horde discovery disputes until late

K5LLSHNC

1    in the discovery period.  Instead, if there is a discovery

2    dispute, you should bring it to my attention promptly if you're

3    unable to resolve it so that I can help you resolve it, so that

4    discovery will be completed by the deadline for completion of

5    fact discovery.

6         If there is a discovery dispute that you sit on until

7    late in the discovery period, such that you cannot get used

8    information during the discovery period, you should not expect

9    that I will compel your adversary or third party to produce the

10   information.  That's because my expectation is that you

11   complete discovery by this date.  So if you choose to sit on

12   your rights waiting for time to pass, you should expect that

13   I'll hold you to the consequences of that decision.  You should

14   not expect that I will extend this deadline to permit to you

15   litigate discovery disputes, because it's not a deadline for

16   litigation about discovery, it's the deadline for completion of

17   discovery.

18        The second corollary that I want to highlight is

19   simply the fact that these deadlines and meeting them will

20   require that you take into account the fact that they are

21   deadlines that you're scheduling a request for information and

22   depositions.  Just to give you a simple example of what I mean:

23   Here, depositions can be completed up through and including

24   October 30th, 2020, and that is fine.  Understand, however,

25   that to the extent that you defer a deposition until late in

1    the discovery period will simply mean that you'll have less

2    time to do followup discovery with respect to any information

3    that you might glean during the depositions or in response to a

4    late-served request for information.  So keep that in mind both

5    as you are scheduling requests for information and depositions

6    and as you are choosing how to respond to failures by your

7    adversary to respond timely to previously propounded requests

8    for information.  Good.

9          So the other thing I want to highlight is that while

10   all of these are real deadlines, I think the deadline in

11   paragraph 8(c) are worthy of particular note.  That's the

12   paragraph that requires disclosure of expert disclosures as

13   required under Rule 26(a)(2).  There are a couple things that I

14   want to highlight about this paragraph:

15         First, the paragraph requires that you provide all of

16   the required disclosures under Rule 26(a)(2) by the date

17   specified.  It is not sufficient for you, for example, to

18   provide merely your expert's name by the date specified here.

19   Instead, you must provide one hundred percent of the

20   disclosures required under the rules by that date.  So her

21   name, her report, her list of prior testimony, all of the

22   things required under the rule have to be disclosed.  Look at

23   the rule to see what must be disclosed and prepare to provide

24   all of that by the specified date.  If you fail to provide all

25   of those disclosures by the relevant date, you should not

1   expect to hear an expert will be permitted to provide testimony

2   or other evidence in the case.

3          The second thing I want to highlight about this

4   paragraph is the fact that under the federal rules, there are

5   experts that give reports and there are experts that don't give

6   reports.  They are both experts, however.  I'm going to refer

7   to them now as report-giving and non-report-giving experts.

8   Somebody like a treating physician may testify without giving a

9   report, but the scope of their testimony is substantially

10  limited in the absence of a report.  So if you conclude that an

11  expert need not provide a report, please think carefully about

12  two things:  One, remember that the non-report-giving expert

13  still must disclose information under Rule 26(a)(2).  If you

14  fail to provide the requisite disclosures for a

15  non-report-giving expert by the date specified in paragraph

16  8(c), that expert too will, you should expect, not be permitted

17  to provide evidence or testimony in the case.

18         Second, for any person who is a treating physician or

19  other non-report-giving expert, you should think about what the

20  testimony is that you wish for her to provide well in advance

21  of the disclosure deadline in paragraph 8(c).  I suggest that

22  simply because if you fail to provide an expert report for that

23  expert, then her testimony will be limited to that which is

24  permitted in the absence of a report.  So please be mindful of

25  that fact as you're deciding whether a report should be

K5LLSHNC

1   provided for any given expert witness.  Again, if you fail to

2   provide a report, you should expect that her testimony will be

3   limited to that as permitted in the absence of a report.  You

4   should not expect that I'll let you fill in the gaps after the

5   fact by providing a late report.

6          Good.  So I'll issue this order.  I'll grant

7   extensions of the deadline here, but only for good cause shown.

8   I do scrutinize requests to ensure that there is good cause, so

9   don't expect that I'll grant an extension because the parties

10  agree to one, for example.  Similarly, bear in mind that my

11  expectation is that you'll make professional judgments about

12  the amount of resources that you want to invest in this case.

13  So if you choose to spend time on other cases instead of this

14  one, you shouldn't expect that that will give rise to a finding

15  of good cause by the Court.  Instead, you may find that I will

16  ask you to live with the consequences of your decision about

17  what you want to focus your energies on.  So I'm giving you

18  this resource.  If you choose to use it poorly, you should not

19  expect that I will rescue you from that decision by extending

20  the deadlines.  I will scrutinize the requests and ensure that

21  there is good cause.

22          Now, while -- as I'm about to say -- I hope that the

23  parties will work to resolve this case amicably, my expectation

24  is that your efforts to resolve the case amicably will happen

25  in parallel with your efforts to litigate the case in

K5LLSHNC

1   accordance with the schedule that will be set forth in the case

2   management plan.

3           Now, there was commentary earlier about remote

4   depositions.  My hope is that the parties will confer about

5   that.  The rules provide two means for remote depositions:  One

6   is for the parties to agree to it.  Otherwise, the Court can

7   permit depositions upon motion by a party.  Many of my

8   colleagues, you should know, have standing orders that, as a

9   result of the pandemic, basically authorize all depositions to

10  take place remotely by Zoom or whatever the system may be.  I

11  have not done that, but I've heard several motions to permit

12  remote depositions.  My hope is that the parties will work

13  together to develop a proposal with respect to those.  If for

14  any reason, the parties do not agree to remote depositions for

15  any given witness, I invite you to bring it to my attention so

16  that I can, as described in the rule on motion, make a

17  determination regarding whether or not when it's appropriate.

18          I strongly encourage the parties to talk promptly

19  about ESI-related issues, particularly custodians and search

20  terms that can be an issue.  And I encourage you to focus on

21  that at the outset of the discovery process, particularly as

22  you're collecting information that can be collected remotely.

23          Good.  So I'll enter this case management plan with a

24  single modification no later than today or tomorrow.  And that

25  will govern the parties' conduct going forward.

K5LLSHNC

```
 1              I should ask whether or not there's anything that I

 2   can do to help the parties resolve the case amicably.  Please

 3   let me know if there is.  I'm happy to do something that could

 4   be helpful for you.  You know, the Court has two annexed

 5   mediation programs and we have four magistrate judges who

 6   dedicate a substantial portion of their time to help parties

 7   settle cases.  We also have a mediation program which is

 8   staffed by volunteer mediators with experience in the area.

 9   I'd be happy to refer you to either of those resources.  It's

10   not clear to me that the parties are ready to engage in that

11   kind of conversation at this point, but it's always beneficial

12   in my view to have an open line of communications about a

13   potential resolution of the case.

14              Let me know, counsel, if you would, if you think it

15   would be helpful for me to refer you to either of those options

16   now.  If not now, please be aware that I'm happy to make them

17   available to you in the future if your assessment changes.  Let

18   me turn first to counsel for plaintiffs.

19              Counsel, is there anything I can do at this time to

20   help the parties resolve the case?

21              MR. RATNER:  Well, your Honor, I think what you said

22   kind of applies to this case and as we see it now, and that is

23   that we're pretty far apart.  And I'm hoping that the discovery

24   will narrow this gap on one side or another.  And, you know,

25   I've had opportunities to settle cases with the help of a
```

K5LLSHNC

1   myriad of magistrate judges in this district.  And so if the

2   opportunity comes in this case, I will not hesitate to seek a

3   referral, your Honor.

4          We're not -- I mean, it does say in the order we're

5   not against private mediation, but that's a cost that will be

6   incurred.  So I'm happy to share that.  And, you know, that the

7   Court provides a mediation program and it still is working, you

8   know -- but my preference first would be to try to get it over

9   to a magistrate judge, your Honor.

10          THE COURT:  That's fine.  Please let me know in the

11   future if you think it would be helpful.  Yes, our mediation

12   program is still working.  I'm informed that it is still

13   vibrant.  Good.  I think that's all that I wanted to take up

14   here.

15          Anything else that we need to discuss before we

16   adjourn, first, counsel for plaintiffs?

17          MR. RATNER:  No, your Honor.

18          THE COURT:  Thank you.

19          Counsel for defendant?

20          MR. TAUSTER:  Your Honor, this is David Tauster.

21          Nothing further from defendants.  Thank you very much

22   for your time and attention today.

23          THE COURT:  Thank you.  My pleasure.

24          I think there's one thing that I'm going to mention,

25   although I don't think I need to.  But it's occurred to me, so

K5LLSHNC

1    I may as well.

2          I'm presiding over another case also involving State

3    Street.  It does not involve claims of discrimination.  It's a

4    trademark case involving The Fearless Girl statute.  It has, as

5    far as I can tell, no impact.  I see no basis to recuse myself

6    or anything as a result.  But I thought that the parties might

7    be interested in knowing that fact, so I am letting you know

8    that fact.

9          MR. RATNER:  Thank you, your Honor.

10          THE COURT:  Good.  Thank you, all.

11                          ******

12

13

14

15

16

17

18

19

20

21

22

23

24

25